672 F.2d 464
 ROGERS TERMINAL AND SHIPPING CORPORATION, Plaintiff,
v.
INTERNATIONAL GRAIN TRANSFER, INC., Plaintiff-Appellee,
v.
The M/V JOHN 3:36, et al., Defendants,
Philip Alan Froude, on behalf of Certain Underwriters at
Lloyd's of London, Defendant-Appellant.
 No. 81-3238.
 United States Court of Appeals,
Fifth Circuit.
 April 5, 1982.
 
 Patrick L. Burke, New Orleans, La., for defendant-appellant.
 Terrence C. Forstall, John S. Hunter, New Orleans, La., Cordell H. Haymon, Baton Rouge, La., for Intern. Grain Transfer, Inc.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.
 PER CURIAM:
 
 
 1
 Upon consideration of the briefs, the record, and the oral argument of counsel for the respective parties, we affirm on the basis of the appended opinion of the district court.
 
 
 2
 AFFIRMED.
 
 APPENDIX
 PATRICK E. CARR, District Judge:
 
 3
 Plaintiffs, Rogers Terminal and Shipping Corporation and International Grain Transfer, Inc., brought this suit to recover damages sustained when the M/S MITSUI MARU collided with the COMMIT II, while being towed by the M/V JOHN 3:36 downbound in the Mississippi River.
 
 
 4
 Named as defendants were the M/V JOHN 3:36 and the M/S MITSUI MARU in rem, and their respective owners and/or operators and/or charterers, in personam.
 
 
 5
 Rogers Terminal and Shipping Corporation was the bareboat charterer, thus owner pro hac vice, of the COMMIT II at the time of the collision. The COMMIT II, which is a floating grain elevator, is owned by International Grain Transfer, Inc.
 
 
 6
 Plaintiffs, in a first amended complaint, added as defendants Taisho Marine and Fire Insurance Company, Great Atlantic Insurance Company and Underwriters at Lloyd's. Taisho was the insurer of the M/S MITSUI MARU and its owners, Great Atlantic and Lloyd's were the primary and excess insurers of the M/V JOHN 3:36 and its owners, respectively.
 
 
 7
 Plaintiff, Rogers Terminal and Shipping Corporation, settled its claim against all defendants prior to trial in this matter.
 
 
 8
 The parties stipulated that the M/V JOHN 3:36, through its owner and operator, was one hundred (100%) percent at fault in causing the collision and the damage to the COMMIT II resulting therefrom. The MITSUI MARU and its interests were dismissed from the lawsuit. Counsel for Lloyd's has assumed the defense of the M/V JOHN 3:36 and its owners as excess insurer of the vessel.
 
 
 9
 The only issue before the Court at trial in this matter was the amount of damages to which plaintiff, International Grain Transfer, Inc., is entitled for the loss of the use of the vessel, profits and income for the two hundred seven-day repair period in which the vessel was inoperable. The parties have stipulated that this period of time was fair and reasonable in order to effect the necessary repairs.
 
 
 10
 International Grain Transfer, Inc. was incorporated in 1976. The only asset of the business is the COMMIT II, a structure which was converted from a tank barge to a floating grain elevator. Plaintiff purchased the barge for the sole purpose of such conversion sometime prior to October, 1978.
 
 
 11
 On September 27, 1978, Rogers Terminal and Shipping Corporation, a national stevedoring firm, entered into a bareboat charter contract with International Grain Transfer, Inc. for the use of the COMMIT II. This agreement went into effect October 5, 1978. The bareboat charter provided that International Grain would receive one dollar and fifty cents per metric ton of grain product handled by the COMMIT II. Though not provided by the contract, Rogers also paid International Grain thirty-five (35%) percent of the amount charged for discharge jobs completed by the COMMIT II, for which Rogers is paid per hour, as opposed to per unit.
 
 
 12
 The contract could be cancelled by either party upon ninety (90) days notice or immediately by International Grain in the event of non-use by Rogers during any calendar month.
 
 
 13
 In October, 1978, when the COMMIT II was taken to New Orleans, it was not completely prepared for operation. Testing and various adjustments to iron out the kinks ensued until February, 1979, when the elevator was considered to be fully operational.
 
 
 14
 On March 18, 1979, the collision in question occurred. The COMMIT II remained out of operation for repairs for a period of two hundred seven (207) days, from March 18, 1979 to October 10, 1979.
 
 
 15
 Defendant argues that since the COMMIT II was under bareboat charter to Rogers, as owner pro hac vice of the vessel, Rogers was the only party who had a cause of action for loss of profits. Defendant claims that the only right International Grain had was that as owner in title only, specifically the right of reversion upon termination of the charter.
 
 
 16
 The Court finds that the plaintiff, as owner of the COMMIT II, is entitled to recover from the defendant for damages incurred as a result of the collision. The fact that the vessel was bareboat chartered at the time of the collision is not such to establish that plaintiff relinquished all proprietary interest and consequently could not recover.
 
 
 17
 The cases cited by defendant, Robins Dry Dock and Repair Company v. Flint, et al., 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) and Cargill, Inc. v. Offshore Logistics, Inc., 615 F.2d 212 (5th Cir., 1980), clearly do not stand for the proposition that the actual owner of a vessel does not have a right to recover damages sustained when the tortious conduct of another party denies the owner the right to derive income from the damaged property; rather, Robins, supra, as well as Cargill, Inc., supra, involved situations where the parties seeking recovery had no proprietary interest in the damaged property. It is well established that the owner of a vessel has the right to recover from a tortfeasor who causes physical damage to the vessel. Gilmore and Black, The Law of Admiralty, 2nd Ed., p. 239. McDonough Marine Service, Inc. v. M/V ROYAL STREET, 465 F.Supp. 928 (E.D.La.,1979). Affirmed, 608 F.2d 203 (5th Cir., 1979).
 
 
 18
 The Fifth Circuit has held that while loss of profits must be proved with reasonable certainty, the mere fact that such damages may not be susceptible of exact measurement does not make them any less recoverable. Mechanical Wholesale, Inc. v. Universal-Rundle Corp., 432 F.2d 228 (5th Cir., 1970), Natco, Inc. v. Williams Brothers Engineering Co., 489 F.2d 639 (5th Cir., 1974).
 
 
 19
 The evidence shows that the COMMIT II had reached full operational capacity in February, 1979, only one month prior to the collision. From that time until the collision, the vessel handled three thousand five hundred twenty-two (3,522) long tons of grain product and one discharge job for which the amount of income is unknown.
 
 
 20
 From the time the vessel was repaired in October, 1979, until January 7th, 1980 when a fire occurred, the vessel handled grain generating eighty-three thousand one hundred sixty-five dollars and forty-six cents ($83,165.43) income to International Grain. Based on this eighty-eight-day period, International Grain would have averaged nine hundred forty-five ($945.00) dollars per day, totalling one hundred ninety-five thousand six hundred twenty-seven dollars and forty-two cents ($195,627.42) for the two hundred seven-day repair period. While the charter did not terminate until March 18, 1980, only one job was performed between January 7th and March 18th because a fire on the vessel rendered it inoperable for approximately two and a half months.
 
 
 21
 Michael Mahoney, the manager of stevedoring for Rogers in New Orleans, testified that after the rig was repaired only small jobs were sought for the COMMIT II, in order to make sure that the rig was operating properly and because he did not want to attempt large jobs for good customers in case it did not operate properly. He testified that this practice continued until termination of the charter.
 
 
 22
 The Court feels the performance of the COMMIT II in the months immediately following the repairs is an inaccurate measure of plaintiff's damages because Rogers was not actively soliciting business for the COMMIT II due to the fact that it had decided to terminate the charter during the summer of 1978, months before the vessel returned to service and the charter was subsequently terminated.
 
 
 23
 Michael Mahoney also testified that a decision was made by Rogers to terminate the charter if a profit was not shown by the end of 1979. He testified that he hoped to have up to one million (1,000,000) tons per year of grain product for the COMMIT II to handle, based on the market in New Orleans area and his experience with the K-1, a floating grain elevator owned by Rogers and operated in the Baton Rouge area.
 
 
 24
 Charles Augustine, a supervisor for Rogers, testified that based on the volume of grain handled in the Port of New Orleans per year, he expected the COMMIT II to handle about eighty thousand (80,000) to one hundred thousand (100,000) tons per month. He also testified that there had been five (5) floating grain elevators in the New Orleans area. Wallace Mabry, general manager of Rogers, testified that there were six (6) floating grain elevators in the New Orleans area. Mr. Augustine further testified that approximately eight million (8,000,000) tons of grain product was handled in the Port of New Orleans on an annual basis.
 
 
 25
 Considering the volume of business available in New Orleans and Mr. Augustine and Mr. Mahoney's testimony as to how much they anticipated the COMMIT II would have handled, the Court feels that it is reasonable to conclude that the COMMIT II would have handled a considerable amount of grain, at least as much as it did in the Baton Rouge area the following year.
 
 
 26
 Invoices issued by International Grain Transfer for jobs performed by the COMMIT II in the Baton Rouge area between March 18th, 1980, the date upon which the charter terminated up to date of trial, October 6th, 1980, were admitted into evidence. This period of time is analogous to the two hundred seven-day period for repairs in 1979, from March 18th to October 10th. Richard Comstock, president and part owner of International Grain Transfer, testified that between the time of termination of the charter and August 31st, 1980, International Grain received in gross income nine hundred forty-six thousand two hundred fifty-nine and 54/100 ($946,259.54) dollars from the operation of the COMMIT II. Of this amount, he testified that six hundred sixty-eight thousand one hundred twenty and 39/100 ($668,120.39) dollars went toward expenses, thus resulting in a net profit of two hundred seventy-eight thousand six hundred forty-nine and 15/100 ($278,649.15) dollars for that period of time. He further testified that the COMMIT II handled during that period of time an average of twenty-eight thousand two hundred thirty-eight and 37/100 (28,238.37) metric tons per month in grain products. It is noted that the evidence further indicated that International Grain was realizing a profit of approximately two ($2.00) dollars per ton on grain handled in the Baton Rouge area, as opposed to one and 50/100 ($1.50) dollar per metric ton to which they were entitled under the charter with Rogers Terminal and Shipping Corporation.
 
 
 27
 The invoices of International Grain concerning billing for this work done one year later indicates to the Court that approximately one hundred seventy-two thousand two hundred forty-four (172,244) metric tons of grain products were handled by the COMMIT II. Applying the one and 50/100 ($1.50) dollar per metric ton amount which was provided by the charter to this amount of grain handled, it is reasonable to conclude that the COMMIT II would have earned a total of two hundred fifty-eight thousand three hundred sixty-six ($258,366.00) dollars were the amount of work being performed by it in the following year being performed at the time of the charter.
 
 
 28
 The Court feels that the period of time in 1980 analogous to the shut-down period in 1979 is most indicative of the amount International Grain would have received under the charter, but for the collision which occurred. For these reasons, the Court finds the plaintiff is entitled to the amount of two hundred fifty-eight thousand three hundred sixty-six ($258,366.00) dollars.