**BARBER LINES A/S, et al.,
Plaintiffs, Appellants,**

v.

**M/V DONAU MARU, et al.,
Defendants, Appellees.**

**No. 84–1851.**

United States Court of Appeals,
First Circuit.

June 14, 1985.

* Of the Third Circuit, sitting by designation.

James B. Conroy, Boston, Mass., with whom Charles R. Parrott, Robert S. Brintz and Nutter, McClennen & Fish, Boston, Mass., were on brief, for plaintiffs, appellants.

E. Susan Garsh, Boston, Mass., with whom Thomas H. Walsh, Jr. and Bingham, Dana & Gould, Boston, Mass., were on brief, for defendants, appellees.

Before BREYER, Circuit Judge, ROSENN,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BREYER, Circuit Judge.

In December 1979 the ship Donau Maru spilled fuel oil into Boston Harbor. The spill prevented a different ship, the Tamara, from docking at a nearby berth. The Tamara had to discharge her cargo at another pier. In doing so, she incurred significant extra labor, fuel, transport and docking costs. The Tamara, her owners, and her charterers sued the Donau Maru and her owners in admiralty. Insofar as is here relevant, they claimed negligence and sought recovery of the extra expenses as damages. The district court denied recovery on the basis of the pleadings, citing as

authority *Petition of Kinsman Transit Co.*, 388 F.2d 821 (2d Cir.1968) ("*Kinsman II*"). The plaintiffs have appealed. We believe the district court was correct, and we affirm its judgment, for three related sets of reasons.

1. Plaintiffs-appellants seek recovery for a financial injury caused by defendants' negligence. We assume that the injury was foreseeable. Nonetheless controlling case law denies that a plaintiff can recover damages for negligently caused financial harm, even when foreseeable, except in special circumstances. There is present here neither the most common such special circumstance—physical injury to the plaintiffs or to their property—nor any other special feature that would permit recovery. *See* pp. 55–56 *infra*.

The leading "pure financial injury" case is *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) (Holmes, J.). Flint had chartered a ship, agreeing with its owners to have the ship docked for repairs every few months. During that time Flint would neither use the ship nor pay rent. The dry dock negligently damaged the ship's propeller, delaying repairs, and causing Flint to lose the use of the ship for two weeks. The Court held that the ship's owners might sue for negligent damage to the ship, but the charterer, suffering no *physical* injury to himself or to his property, could not do so. Justice Holmes wrote,

> as a general rule, at least, a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong. See *Savings Bank v. Ward*, 100 U.S. [ (10 Otto) ] 195 [25 L.Ed. 621]. The law does not spread its protection so far. A good statement, applicable here, will be found in *Elliot Steam Tug Co., Ltd. v. The Shipping Controller*, [1922] 1 K.B. 127, 139, 140. *Byrd v. English*, 117 Ga. 192 [43 S.E. 419]. *The Federal No. 2*, 21 F.(2d) 313.

*Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. at 309, 48 S.Ct. at 135. The facts of *Robins* are strikingly similar to the present case. Just as the damaged propeller prevented Flint from using the ship, so the oil spill prevented the appellants from using the dock. The defendants in both cases were negligent. The injury in both cases (despite Holmes' use of the word "unknown") seems likely foreseeable. The harm in both cases was purely financial, without accompanying physical harm to person or property.

While we see three possible grounds of distinction, we do not believe them controlling. First, Flint alleged a specific contract with the shipowner, while the appellants here do not allege a contract with the dock. The authority that Justice Holmes says contains a "good statement" of the legal principle does not, however, turn so much on the existence of a formal contract as on the existence of limitations upon tort recovery for financial injury, *see Elliot Steam Tug Co., Ltd. v. The Shipping Controller*, *supra; Byrd v. English*, 117 Ga. 192, 43 S.E. 419 (1902). Moreover, the present appellants must have had a "right" to use the dock; and interference with that "right" caused the loss. It is difficult in this instance to see why the technical legal label applied to that right should make a legal difference.

Second, Flint apparently sued for lost profits. Appellants here sue for expense. Typically, an extra expense is more easily proved than a lost profit. Again, however, Justice Holmes points to authority that includes both added expenses and lost profits, *see Savings Bank v. Ward*, 100 U.S. (10 Otto) 195, 25 L.Ed. 621 (1879); *The Federal No. 2*, 21 F.2d 313 (2d Cir.1927). Other cases, decided both before and after *Robins*, for the most part make no such distinctions. *E.g., Hercules Carriers, Inc. v. Florida*, 720 F.2d 1201 (11th Cir.1983), *aff'd by an equally divided court*, 728 F.2d 1359 (1984) (en banc); *Marine Navigation Sulphur Carriers, Inc. v. Lone Star Industries, Inc.*, 638 F.2d 700 (4th Cir.1981); *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931); *Con-*

necticut Mutual Life Insurance Co. v. New York & New Haven Railroad, 25 Conn. 265 (1856); Caltex Oil v. The Dredge "Willemstad", 11 A.L.R. 227 (Austl.H.C. 1976); Chargeurs Reunis Compagnie Francaise de Navigation a Vapeur v. English & American Shipping Co., 9 Lloyd's List, L.R. 464 (1921); Cattle v. Stockton Waterworks Co., L.R. 10 Q.B. 453 (1875).

Third, one might claim that Robins is wrong or out of date and, therefore, that the inferior courts are free to "limit" it through a narrow reading. For reasons set out below, however, we think the principles underlying Robins remain legally sound insofar as they place plaintiffs like those before us "outside the scope" of those to whom defendant owes a legal duty of care. Cf. Sinram v. Pennsylvania Railroad, 61 F.2d 767 (2d Cir.1932) (Hand, J.); Palsgraf v. Long Island Railroad, 248 N.Y. 339, 162 N.E. 99 (1928) (Cardozo, J.).

In Kinsman II, supra, another leading case, the Second Circuit more recently came to the same result as the Supreme Court in Robins Dry Dock. In Kinsman II, defendant's ship broke loose from her moorings, crashed into another ship, then into a bridge, and, subsequently, with the help of ice floes, created a barrier that prevented other ships from moving upstream to unload cargo. The Second Circuit held that the financial injuries suffered by these other ships—extra unloading expenses—were too "remote" to warrant recovery. The court analogized the careening ship to a negligent driver who crashes into another car in a tunnel. Such a driver, though negligent, is not thought liable for all the inevitable (and foreseeable) financial losses resulting from the delays that he has caused. We can find in the case before us no relevant distinction from Kinsman II.

Appellants argue that Kinsman II raises a factual issue of "foreseeability." We read Kinsman II, however, not as saying that the injury, as a matter of fact, was unforeseeable but, rather, as drawing a legal line, based on considerations of policy, cf. Sin-

ram, supra, that forbids compensation for certain types of foreseeable, negligently caused, financial injury. The details of the Kinsman II accident were unusual, but the precise details of many, or most, accidents cannot be foreseen in advance. Rather, foreseeability is a matter of a class, or type, of harm. And, in terms of perfectly traditional, reasonably specific, common-sense classes, the Kinsman II blockade, delay, and extra cost were foreseeable. Still more so are the extra costs involved in the analogous Kinsman II example, the extra trucking costs arising from tunnel accident delays. Viewing the legal implications of Kinsman II in this way, we cannot distinguish a barrier created by an oil spill from a barrier created by a careening ship, each of which increases unloading costs by requiring other ships to go elsewhere. It is still more difficult for us to distinguish this case from delays created by, say, tunnel accidents, which are likely to mean extra cost for truckers, shippers and merchants, all of which are foreseeable.

A third major, and recent, decision is that of the Fifth Circuit in Louisiana ex rel. Guste v. M/V Testbank, 752 F.2d 1019 (5th Cir.1985). The majority in that case sets forth a reasonably clear rule, which says that one who suffers only financial loss, unaccompanied by physical injury, cannot recover damages from a negligent defendant, whether or not the financial loss is foreseeable. The holding is consistent with the way in which most commentators have characterized pre-existing case authority. See James, Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal, 25 Vand.L.Rev. 43 (1972) ("[A] plaintiff may not recover for his economic loss resulting from bodily harm to another or from physical damage to property in which he has no proprietary interest."); Atiyah, Negligence and Economic Loss, 83 L.Q.Rev. 248, 249 (1967) (no "remedy for purely financial loss in the law of negligence to a person who had suffered such loss as a result of damage to, or the destruction of, a chattel in which he had no proprietary or possessory interest"). The holding also invalidates the authority of

several Fifth Circuit cases on which appellants here rely, and which in any event expressed a minority view. *See Micmar Motorship Corp. v. Cabaneli Naviera, S.A.,* 477 F.Supp. 45 (E.D.La.1979); *vacated and remanded,* 620 F.2d 298 (5th Cir. 1980); *In re Lyra Shipping Co.,* 360 F.Supp. 1188 (E.D.La.1973); *In re China Union Lines, Ltd,* 285 F.Supp. 426 (S.D. Tex.1967). We need not embrace the whole of *Testbank*'s rule in order to recognize that it constitutes additional, strong case law against allowing appellants to recover here.

We note that the courts in the cases we have cited have not always used the same legal terminology to describe their conclusions. One might, for example, use Judge Hand's language in *Sinram,* and say that plaintiffs like those before us are persons to whom appellee owes no "duty of care." Alternatively, one could use the slightly more obscure "proximate cause" terminology, and say that plaintiffs' injuries are too "remote." One could also appeal to historic legal terminology, and describe plaintiffs as suffering *damnum absque injuria.* Regardless of descriptive terminology, the holdings of these major cases are the same. They refuse to hold a defendant liable for negligently caused financial harm without accompanying physical injury or other special circumstances, *see* pp. 55–56, *infra,* none of which is present here. *E.g., Cattle v. Stockton Waterworks Co., supra* (no recovery for builder's contractual losses caused by tunnel obstruction); *Weller & Co. v. Foot & Mouth Disease Research Institute,* 1 Q.B. 569 (1966) (no recovery by cattle auctioneers for losses caused by virus escaped from research institute); *Robins Dry Dock & Repair Co. v. Flint, supra; Petition of Kinsman Transit Co., supra.*

2. Before affirming the district court on the basis of existing precedent, we have asked ourselves whether that precedent remains good law. After all, courts have sometimes departed from past legal precedent where changing circumstances viewed in light of underlying legal policy deprived that precedent of sound support. *See, e.g.,*

*Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922) (Cardozo, J.); *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916) (Cardozo, J.). Here, however, precedent seems, at least in general, to rest on a firm policy foundation. The same judges who removed other recovery limitations left this one firmly in place, *compare Glanzer v. Shepard, supra,* and *MacPherson v. Buick Motor Co., supra,* with *Ultramares Corp. v. Touche, supra* (Cardozo, J.). Much written commentary, which for a time in the 1940's attacked the limitation, *see* W. Prosser, *Handbook on the Law of Torts* 993 (1st ed. 1941), Carpenter, *Interference with Contract Relations,* 41 Harv.L.Rev. 728 (1928), has more recently supported it, while offering a variety of refinements. *See* Rizzo, *A Theory of Economic Loss in the Law of Torts,* 11 J.Leg. Stud. 281 (1982) (advocating recovery where its value outweighs "channeling" costs and litigation costs); Bishop, *Economic Loss in Tort,* 2 Oxford J.Leg.Stud. 1 (1982); Atiyah, *supra* (advocating minor changes); James, *supra. But see* Coval, Smith & Rush, *"Out of the Maze": Towards a "Clear Understanding" of the Test for Remoteness of Damages in Negligence,* 61 Can.B.Rev. 559 (1983) (advocating recovery when damage falls within a class of foreseeable damages); Seidelson, *Some Reflections on Proximate Cause,* 19 Duq. L.Rev. 1 (1980) (advocating test based on inquiry into relationship between defendant's conduct and plaintiff's commercial activities). Indeed, foreign civil law systems, which do not distinguish between financial and physical harm, nonetheless seem to have devised other rules that lead to similar results. *See* Marshall, *Liability for Pure Economic Loss Negligently Caused—French and English Law Compared,* 24 Int'l & Comp.Q. 748 (1975).

The cases and commentaries, in making a plausible argument that existing precedent rests on sound considerations of policy, also reveal that these considerations are highly general and abstract. Judges lack the empirical information that would allow measurement of their force or magnitude;

and, in particular, judges cannot apply these considerations on a case by case basis.

We have concluded that we could not find for appellants here without ignoring these policy considerations, or at a minimum, applying them case by case, a practice that we believe would be unwise. A brief description of the kinds of policy considerations typically advanced as supporting existing law (perhaps with a few modifications) will show why these considerations have led us to conclude that we must adhere to prior precedent.

First, cases and commentators point to pragmatic or practical administrative considerations which, *when taken together,* offer support for a rule limiting recovery for negligently caused pure financial harm. The number of persons suffering foreseeable financial harm in a typical accident is likely to be far greater than those who suffer traditional (recoverable) physical harm. The typical downtown auto accident, that harms a few persons physically and physically damages the property of several others, may well cause financial harm (e.g., through delay) to a vast number of potential plaintiffs. The less usual, negligently caused, oil spill foreseeably harms not only ships, docks, piers, beaches, wildlife, and the like, that are covered with oil, but also harms blockaded ships, marina merchants, suppliers of those firms, the employees of marina businesses and suppliers, the suppliers' suppliers, and so forth. To use the notion of "foreseeability" that courts use in physical injury cases to separate the financially injured allowed to sue from the financially injured not allowed to sue would draw vast numbers of injured persons within the class of potential plaintiffs in even the most simple accident cases (unless it leads courts, unwarrantedly, to narrow the scope of "foreseeability" as applied to persons suffering physical harm). That possibility—a large number of different plaintiffs each with somewhat different claims—in turn threatens to raise significantly the cost of even relatively simple tort actions. *See* Rizzo, *supra.* Yet the tort action is already a very expensive administrative device for compensating victims of accidents. Indeed, the legal time, the legal resources, the delay appurtenant to the tort action apparently mean that on average the victim recovers only between 28 and 44 cents of every dollar paid by actual or potential defendants, while victims who insure themselves directly recover at least between 55 and 66 cents of each premium dollar earned by insurance companies and between 85 and 90 cents of every dollar actually paid out to investigate and satisfy claims. *See* O'Connell, *An Alternative to Abandoning Tort Liability: Elective No-Fault Insurance for Many Kinds of Injuries,* 60 Minn.L.Rev. 503–12 (1976); *Best's Aggregates and Averages: Property-Casualty* 4–5 (1984). *See also* P. Munch, *Costs and Benefits of the Tort System if Viewed as a Compensation system* (Rand 1977); O'Connell, *Offers That Can't Be Refused: Foreclosure of Personal Injury Claims by Defendants' Prompt Tender of Claimants' Net Economic Losses,* 77 Nw.U.L.Rev. 589, 593–96 (1982); James, *supra* at 52 & n. 40. The added cost of the increased complexity, while unknowable with precision, seems likely significant.

At the same time many of the "financially injured" will find it easier than the "physically injured" to arrange for cheaper, alternative compensation. The typical "financial" plaintiff is likely to be a business firm that, in any event, buys insurance, and which may well be able to arrange for "first party" loss compensation for foreseeable financial harm. Other such victims will be able to sue under tort principles, for they will suffer at least some physical harm to their property. Still others may have contracts with, or be able to contract with, persons who can themselves recover from the negligent defendant. A shipowner, for example, might contract with a dock owner for "inaccessibility" compensation; and the dock owner (whose pier is physically covered with oil) might recover this compensation as part of its tort damages. *See* Rizzo, *supra* at 293. Of course, such a tort suit, embodying a "contract-defined" injury, may

still raise difficult foreseeability questions, *cf. Hadley v. Baxendale,* 9 Exch. 341 (1854). But the bringing of one suit, instead of several, still makes the litigation as a whole a less costly compensation device. *See* Rizzo, *supra;* Atiyah, *supra.* Finally, some of the "financially injured" will have suffered harm that is, in any event, noncompensable because it is not sufficiently distinguishable from minor harms typical of ordinary living. *Cf.* Fletcher, *Fairness and Utility in Tort Theory,* 85 Harv.L.Rev. 536, 543 (1972). The law does not compensate, for example, the cost of unused baseball tickets or flowers needed for apology regardless of the cause of the delay that foreseeably led to the added expense. Insofar as these considerations, taken as a whole, support recovery limitations, they reflect a fear of creating victim compensation costs that, from an administrative point of view, are unnecessarily high. *See Stevenson v. East Ohio Gas Co.,* 73 N.E.2d 200, 202 (Ohio 1946).

A second set of considerations focuses on the "disproportionality" between liability and fault. Those who argue "disproportionality" are not reiterating the discredited nineteenth century view that tort liability would destroy industry, investment, or capitalism. *See* F. Wharton, *A Suggestion as to Causation* 11 (1874); Horwitz, *The Doctrine of Objective Causation,* in *The Politics of Law: A Progressive Critique* 201 (D. Kairys, ed. 1982). Rather, they recognize that tort liability provides a powerful set of economic incentives and disincentives to engage in economic activity or to make it safer, *see generally* G. Calabresi, *The Costs of Accidents* (1970). And, liability for pure financial harm, insofar as it proved vast, cumulative and inherently unknowable in amount, could create incentives that are perverse.

Might not unbounded liability for foreseeable financial damage, for example, make auto insurance premiums too expensive for the average driver? Is such a result desirable? After all, the high premiums would reflect not *only* the costs of the harm inflicted; they would also reflect administrative costs of law suits, jury verdicts in uncertain amounts, some percentage of unbounded or inflated economic claims, and lessened incentive for financial victims to avoid harm or to mitigate damage. Given the existing liability for physical injury (and for accompanying financial injury), can one say that still higher premiums are needed to make the public realize that driving is socially expensive or to provide greater incentive to drive safely (an incentive that risk spreading through insurance dilutes in any event, *see* Shavell, *On Liability and Insurance,* 13 Bell J. of Econ. 120 [1982] )?

These considerations, of administrability and disproportionality, offer plausible, though highly abstract, "policy" support for the reluctance of the courts to impose tort liability for purely financial harm. While they seem unlikely to apply with equal strength to every sort of "financial harm" claim, their abstraction and generality, along with the comparative inaccessibility of the empirical information needed to confirm or to invalidate them, mean that courts cannot weigh or apply them case by case. What, for example, in cases like this one, are the added administrative costs involved in allowing all persons suffering pure financial harm to sue the shipowner instead of "channeling" suits (perhaps via contract) through traditionally injured plaintiffs? Is there a problem of "disproportionality"? How far, for example, would additional, unbounded, pure financial loss liability for negligently caused oil spills, when added to the already large potential traditional liability, affect the type of insurance carried, the incentive to mitigate losses, the incentive to transport oil safely, the likelihood that shippers will use pipelines and domestic wells instead of ships and foreign wells, and the consequences of these and other related changes? We do not know the answers to these questions, nor can judges readily answer them in particular cases.

It does not surprise us then that, under these circumstances, courts have neither enforced one clear rule nor considered the

matter case by case. *Cf.* Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv.L.Rev. 1165, 1249–53 (1967). Rather, they have spoken of a general principle against liability for negligently caused financial harm, while creating many exceptions. *See, e.g.,* 1) *Newlin v. New England Telephone & Telegraph Co.,* 316 Mass. 234, 54 N.E.2d 929 (1944) (accompanying physical harm); 2) *Lumley v. Gye,* 2 El. & Bl. 216, 118 Eng.Rep. 749 (1853); *Beekman v. Marsters,* 195 Mass. 205, 80 N.E. 817 (1907) (intentionally caused harm); 3) *Dalton v. Meister,* 52 Wis.2d 173, 188 N.W.2d 494 (defamation), *cert. denied,* 405 U.S. 934, 92 S.Ct. 947, 30 L.Ed.2d 810 (1971); *Systems Operations, Inc. v. Scientific Games Development Corp.,* 555 F.2d 1131 (3d Cir. 1977) (injurious falsehood); 4) *Hitaffer v. Argonne Co.,* 183 F.2d 811 (D.C.Cir.) (loss of consortium), *cert. denied,* 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed. 624 (1950); 5) *Chicago, Duluth & Georgia Bay Transit Co. v. Moore,* 259 Fed. 490 (6th Cir.) (medical costs of injured plaintiff paid by a different family member), *cert. denied,* 251 U.S. 553, 40 S.Ct. 118, 64 L.Ed. 411 (1919); 6) *Hedley Byrne Co. Ltd. v. Heller & Partners Ltd.,* A.C. 465 (1964) (negligent misstatements about financial matters); 7) *Jones v. Waterman S.S. Corp.,* 155 F.2d 992 (3d Cir.1946) (master-servant); 8) *Western Union Telegraph Co. v. Mathis,* 215 Ala. 282, 110 So. 399 (1926) (telegraph-addressee); 9) *Union Oil Co. v. Oppen,* 501 F.2d 558 (9th Cir.1974) (commercial fishermen as special "favorites of admiralty"). These exceptions seem designed to pick out broad categories of cases where the "administrative" and "disproportionality" problems intuitively seem insignificant or where some strong countervailing consideration militates in favor of liability. Thus an award of financial damages to one *also* caused physical harm does not threaten proliferation of law suits, for the plaintiff could sue anyway (for physical damages). Financial harm awards to family members carry with them an obvious self-limiting principle (as perhaps does awarding such damages to fishermen,

as "favorites" of admiralty). Awarding damages for financial harm caused by negligent misrepresentation is special in that, without such liability, tort law would not exert significant financial pressure to avoid negligence; a negligent accountant lacks physically harmed victims as potential plaintiffs. *See* Atiyah, *supra* at 264.

We need not explore the exceptions in detail. Rather, we here simply point to the existence of plausible reasons underlying the judicial hesitance to award damages in a case like this one, and the need to consider exceptions by class rather than case by case. The existence of these factors, together with our comparative inability to evaluate their empirical significance, cautions us against departing from prior law.

3. We note that several dissenting Fifth Circuit judges in *Testbank, supra,* have advocated abandonment of traditional tort rules in this area and the adoption of a new rule that might allow recovery in this case. They would adopt a principle used to identify the class of private plaintiffs permitted to sue in "public nuisance" cases; and they would allow that class of persons to sue negligent defendants to recover foreseeable financial harm. To be more specific, they would allow "particularly damaged" plaintiffs to sue for financial harms suffered "beyond the general economic dislocation." "Particular damages" would have to be

> different in kind and degree from those suffered by the general public.... [Such damage typically arises] when the plaintiff is prevented from performing a specific contract, or is put to additional expense in performing it.... although plaintiffs who are delayed by a public nuisance cannot recover money for the delay itself ..., they can recover for actual additional expenses, such as extra fuel, additional crew expenses, and greater demurrage charges.

*Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d at 1047–49 (Wisdom, J., dissenting).

We do not believe we can adopt this general principle and apply it here for the

following reasons. First, if meant literally, it would amount to a near reversal of the general judicial principle that (with exceptions) forbids recoveries for negligently caused purely financial losses. Traditionally, the "public nuisance" suit involved an *intentional* tort—say, a deliberate blocking of a highway. The permissible plaintiffs included all those whose damage was different from that of the ordinary traveler. This class consisted of all those suffering definite financial harm, namely virtually all business travelers. *See* W. Prosser & W. Keeton, *Handbook on the Law of Torts* § 90 (1984). It is one thing to allow these persons to sue in the narrow, and relatively unusual, instance of an intentionally caused nuisance; it is quite another to allow them to sue whenever they are negligently, and foreseeably, injured. To do so—to depart from *Robins, Kinsman II* and others—would simply create the problems discussed in Part 2 above.

Second, the *Testbank* minority could escape the general problems discussed in Part 2 only by narrowing the class of plaintiffs—by eliminating some who suffer the type of financial harm that would qualify them as plaintiffs in public nuisance cases. The Fifth Circuit dissenters may want to do this, for they say they would allow delayed ships, bait shops, tackle shops, dry docks, repair services, boat charterers, to sue for financial harm caused by a negligent oil spill. But, they would not allow seafood restaurants or, presumably, grocery stores or owners of other businesses in the area to sue though they may have suffered equivalent, and equally foreseeable, harm. We fear, however, the ad hoc quality of the examples. We recognize the difficulty of avoiding a measure of judicial fiat in the tort area. *Cf. Sinram, supra.* And, we understand the dissenters' efforts to broaden liability in oil spill cases, while maintaining workable, administrable limits. But we do not see in the dissent a principle that would do so—that would broaden liability somewhat without running squarely into the practical problems outlined in Part 2. At best, the dissenters seem to have created a principle that would have to be applied case by case—yet this individualized type of application raises the difficulties we have previously discussed.

Third, we do not see how to apply the dissenters' principle outside the area of oil spills. Their reasoning and examples, applied to tunnel accidents, would allow truckers who ordinarily use the tunnel, firms whose employees use it regularly to commute, and other businesses, to recover for foreseeable financial losses from negligent drivers. While it may make sense to allow such persons to recover from one who intentionally builds a barricade in the tunnel, to allow such suits against a negligent driver raises the problems of Part 2 in full force. We do not believe it practical for courts to distinguish between, say, oil spill accidents and tunnel accidents, depending solely on the industrial context of the accident.

We conclude that we should follow existing precedent that requires us, as a matter of law, to deny recovery. That precedent is reasonably consistent. It is supported by plausible considerations of tort policy. Appellants have failed to bring themselves within any recognized class or category in which financial damages are already allowed, and appellants have failed to provide convincing reasons for the creation of any new exception or class that would work to their legal benefit.

For these reasons, the judgment of the district court is

*Affirmed.*