HOLT HAULING & WAREHOUSING SYSTEMS, INC.

v.

M/V MING JOY, her engines, machinery, tackle and apparel, etc., Retla Steamship Company, and Yangming Marine Transport Corporation

v.

HOLT MARINE TERMINAL, INC.

Civ. A. No. 81–1897.

United States District Court, E.D. Pennsylvania.

July 17, 1985.

Harry P. Begier, Jr., Philadelphia, Pa., for plaintiff.

Douglas P. Riblet, Henry C. Lucas, III, John Mattioni, Philadelphia, Pa., for defendant.

## OPINION

LOUIS H. POLLAK, District Judge.

This case arises out of a March, 1978 accident which damaged Pier 7 on Newton Creek in Gloucester, New Jersey. According to the Complaint, two heavy steel coils fell onto the pier during the course of unloading cargo from the S.S. Ming Joy. Complaint ¶¶ 12–15. The coils allegedly caused extensive damage to the surface of the pier and to the sea wall. Holt Hauling and Warehousing Systems, Pier 7's owner, sued the Ming Joy, its owner (Yangming Marine Transport, hereinafter "Yangming"), and its charterer (Retla Steamship Company, hereinafter "Retla"), alleging that the unseaworthiness of the Ming Joy and the negligence of its personnel caused the accident. Yangming then filed a third-party complaint against the stevedore (Holt Marine Terminal, hereinafter "Holt Marine"), alleging that the stevedore's negligence in unloading the cargo was the cause of the accident. Holt Marine counterclaimed, alleging that Yangming's negligence had cost Holt Marine the use of Pier 7 for some period of time. The counterclaim, as amended, seeks recovery of "stevedoring and related revenues" which Holt Marine lost due to the pier's incapacitation.

The primary claim in this case has settled, so that the sole remaining dispute is between the Yangming and the Ming Joy on the one hand, and Holt Marine on the other. Yangming has moved for summary judgment on Holt Marine's counterclaim, arguing that it is barred by *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). In that case, the Supreme Court, per Justice Holmes, rejected the claim of a ship's time charterer for loss of use of the ship due to the negligence of the defendant dry dock. Yangming contends that *Robins Dry Dock* establishes that Holt Marine cannot recover in tort for economic losses occasioned by damage to property in which Holt Marine had no proprietary interest. Holt Marine accepts the validity of *Robins Dry Dock* and the doctrine it spawned, but argues that it does not bar the counterclaim against Yangming because Holt Marine in fact had a valid property interest in Pier 7 under New Jersey law. Both parties have

briefed and orally argued Yangming's motion.

In addition to their legal arguments, the parties have devoted substantial energy and paper to characterizing the web of business relationships surrounding Pier 7. On this motion for summary judgment, of course, I must resolve all factual disputes in Holt Marine's favor. Fed.R.Civ.P. 56(c); *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.1985). Bearing this standard in mind, I consider below the nature of Holt Marine's relationship to Pier 7 and the significance of that relationship under Robins Dry Dock.

I

Both Yangming and Holt Marine presume that *Robins Dry Dock* bars Holt Marine from recovering on its counterclaim unless Holt Marine had a proprietary interest in Pier 7 at the time of the accident. Consequently, both parties treat the nature of Holt Marine's interest in the pier as the primary issue for purposes of deciding Yangming's motion.

Pier 7's owner was, at all relevant times, Holt Hauling and Warehousing Systems. In July 1976, Holt Hauling leased Pier 7 to Pierpoint Management Corporation. The lease agreement (which is attached as Exhibit A to Holt Marine's answer to Yangming's motion for summary judgment) is triangular: it involves Holt Hauling as landlord, Pierpoint as tenant, and Retla Steamship Company as the chief supplier of shipping business to the pier. (In response to questions from the bench at oral argument, the parties stated that Retla is Pierpoint's corporate parent.) Pierpoint was to operate and maintain the pier, pay utilities, and indemnify Holt Hauling for any liabilities incurred because of Pierpoint's activities.

Rent was to be paid according to the tonnage of Retla cargo unloaded at the pier: base rental was $300,000 per year (based on $2 per short ton on the first 150,000 tons of steel and wood products to be unloaded), plus $1 for every short ton *over* 150,000 which might be unloaded.

Shortly after Pierpoint leased the pier from Holt Hauling, Pierpoint and Holt Marine entered into an informal agreement permitting Holt Marine to use Pier 7 under certain conditions. Under this agreement, Holt Marine was permitted to use Pier 7 to unload cargo from vessels which it had chartered or which it had otherwise induced to unload cargo at Pier 7, to the extent that such use did not interfere with Pierpoint's use of the pier.[1] Holt Marine was not, during the period covered by this agreement, the only stevedore working at Pier 7. Pierpoint employed Cooper Stevedoring to unload Retla vessels; in addition, Cooper was free to bring in other vessels for unloading as long as it did not interfere with Retla business.[2]

In May 1977, Pierpoint made Holt Marine "our exclusive sub-contractor of certain terminal services contemplated at Pier 7."[3] Holt Marine was henceforth to "[p]erform all customary terminal services" as to both Retla vessels and Holt-induced vessels.[4] Under this revised arrangement, Holt Marine was free to arrange to berth vessels as long as its berthing arrangements were consistent with the needs of Retla vessels. In order to implement this limitation, Holt Marine was kept apprised of when Retla vessels would be docking at Pier 7.[5] Holt Marine was not required to give Pierpoint advance notice of its plans to berth non-Retla vessels, but did so "as a courtesy."[6]

---

1. Deposition of Thomas J. Holt at 33–42 (Sept. 19, 1984) [hereinafter "Holt Deposition"]. Mr. Holt was at all relevant times President of Holt Marine. Affidavit of Thomas J. Holt ¶ 1 (Oct. 9, 1984) [hereinafter "Holt Affidavit"].

2. Holt Deposition at 40–41.

3. Letter to Thomas J. Holt from M.R. Cameron (May 4, 1977) [hereinafter "Cameron Letter"].

4. *Id.*

5. Holt Affidavit ¶¶ 4–5.

6. *Id.* ¶ 5. *See also* Deposition of Bernard Gelman at 21–22 (July 18, 1984) [hereinafter "Gelman Deposition].

In return for this largely unrestricted use of Pier 7, Holt Marine agreed to pay Pierpoint according to the volume of cargo unloaded at the pier. No base rental was charged; payment was strictly according to business volume.[7] In addition to its payment obligations, Holt Marine agreed to assume (1) Pierpoint's routine maintenance obligations under Pierpoint's lease agreement with Holt Hauling, and (2) Pierpoint's liability insurance obligations under that lease agreement. Finally, Holt Marine was obliged to pay the cost of any utilities it required to perform its stevedoring services.[8]

The accident which gave rise to this lawsuit occurred while the Ming Joy, a Retla vessel, was being off-loaded at Pier 7. Holt Marine performed stevedoring services for the Ming Joy, as it apparently did for all other Retla vessels using Pier 7.

## II

Both Yangming and Holt Marine assume that *Robins Dry Dock* bars recovery for negligently inflicted harm to a non-proprietary interest. For the reasons that follow, I find this a correct statement of the rule which *Robins Dry Dock* lays down. The parties further presume that, in order to

apply that test to this case, I must look to the state law of New Jersey to determine whether Holt Marine had a "property" interest in Pier 7. This is incorrect. *Robins Dry Dock* and the cases which follow it establish a federal common law limitation on maritime tort recovery. The scope of that limitation turns not on the fine points of state property law but on the judicial economy concerns which spawned the limitation and which give it content. In order better to explain how those concerns apply in this case, I begin by briefly discussing *Robins Dry Dock* and the broader doctrine which it created. Then, I turn to the nature of the interests to which *Robins Dry Dock* applies, in light of the purposes which its doctrine serves. Finally, I return to the particular circumstances of this case, which present, in my view, a difficult problem in the application of *Robins Dry Dock's* sensible but sometimes confining limitation.

### A

In *Robins Dry Dock*, the time charterers of a vessel[9] sued the defendant dry dock for lost profits occasioned by the defendant's alleged negligence in repairing a damaged ship's propeller. At the time of the damage, the vessel was up for regular re-

---

7. Gelman Deposition at 30. Holt Marine did not pay for its use of the pier directly; rather, Pierpoint was permitted to reduce its rental payments to Holt Hauling.

8. Cameron Letter at 1–2.

9. The leading admiralty text defines "time charter" as follows:

> *The Time Charter.* In this form as in the voyage charter, the owner's people continue to navigate and manage the vessel, but her carrying capacity is taken by the charterer for a fixed time for the carriage of goods anywhere in the world (or anywhere within stipulated geographic limits) on as many voyages as approximately fit into the charter period. She is therefore under the charterer's orders as to ports touched, cargo loaded, and other business matters. The time charter is used where the charterer's affairs make it desirable for him to have tonnage under his control for a period of time, without undertaking the responsibilities of ship navigation and management or the long-term financial commitments of vessel ownership. The company

> operating regular liner service may, for example, find itself temporarily short of tonnage and wish to place another vessel in the service; it can do this with relatively slight trouble and without indefinitely long commitment if it can find a suitable vessel to take on time charter.

Gilmore & Black, *The Law of Admiralty* 194 (2d ed. 1975) (quoting Dowell & Gibbs, *Ocean Transportation* 221 (1954)). This arrangement is to be contrasted with the "demise" or "bareboat" charter, under which "the charterer takes over the ship lock, stock and barrel, and mans her with his own people." *Id.* Thus, the time charterer *uses* the owner's ship even while the owner retains a kind of joint possession of the ship; the demise charterer becomes the *lessor* of the ship, and has full possession and control of it.

Justice Holmes' opinion in *Robins Dry Dock* implies that a demise charterer would be able to recover damages for harm to the vessel. *Robins Dry Dock, supra*, 275 U.S. at 308, 48 S.Ct. at 135. *See Louisville & Nashville R.R. v. M/V Bayou Lacombe*, 597 F.2d 469, 473 & n. 3 (5th Cir. 1979).

pairs for which the vessel's owner had contracted with the dry dock. The damage to the propeller required the ship to remain in dry dock an extra two weeks. The time charterers sought to recover for loss of use of the vessel during this two-week period.

The Supreme Court found that the time charterers had no claim for relief against the dry dock:

> [T]he contract of the petitioner [dry dock] with the owners [of the vessel] imposed no immediate obligation upon the petitioner to third persons ..., and whether the petitioner performed it promptly or with negligent delay was the business of the owners and of nobody else. But as there was a tortious damage to a chattel it is sought to connect the claim of the [respondent time charterers] with that in some way. The damage was material to them only as it caused the delay in making the repairs, and that delay would be a wrong to no one except for the petitioner's contract with the owners. The injury to the propeller was no wrong to the respondents but only to those to whom it belonged. But suppose that the respondent's loss flowed directly from that source. Their loss arose only through their contract with the owners—and while intentionally to bring about a breach of contract may give rise to a cause of action, ... no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong.

275 U.S. at 308–09, 48 S.Ct. at 135–36. The Court noted that the time charterers had no property interest in the vessel, and that,

unlike a demise charterer, the time charterers did not even have "possession" of the vessel. *Id.* at 308, 48 S.Ct. at 135. Consequently, the Court held, if the claimants had a legally protected interest in the nonnegligent repair of the vessel's propeller, "it must be worked out through their contract relations with the owners." *Id.*

The Court's holding in *Robins Dry Dock* was potentially quite narrow. The opinion repeatedly notes that the time charter was "unknown" to the assertedly negligent dry dock, *id.*, and on its facts it does not appear automatically to insulate all economic expectancies from the protection of maritime tort law.[10] A closer analysis of Justice Holmes' opinion, however, leads to the conclusion that the case casts a longer shadow.[11] Holmes cited three cases as providing "a good statement" of the applicable principle. *Id.* at 309, 48 S.Ct. at 135 (citing *Elliott Steam Tug Co., Ltd. v. The Shipping Controller,* [1922] 1 K.B. 127, 139, 140; *Byrd v. English,* 117 Ga. 192, 43 S.E. 419 (1903); *The Federal No. 2,* 21 F.2d 313 (2d Cir.1927)). The first of these cases, *Elliott Steam Tug,* stated that at common law the time charterer could not recover even *direct* injuries to "his mere contractual rights" in the chartered vessel. 1 K.B. at 140 (quoted in *Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019, 1022 (5th Cir.1985) (*en banc*)). *Byrd v. English* denied recovery to a printing plant which had temporarily lost electrical power due to the defendant's negligent damaging of a utility's electrical equipment. Finally, in *The Federal No. 2,* the court denied recovery to the employer of a person injured by defendant for the loss occasioned by the employee's injury, on the ground that such a claim was simply "too indirect." 21 F.2d at 314.

**10.** Perhaps as a consequence, *Robins Dry Dock* has on occasion been read to apply only to its particular facts. *See Federal Commerce & Navigation Co. v. M/V Marathonian,* 528 F.2d 907, 908 (2d Cir.1975) (*per curiam*); *Petition of Kinsman Transit,* 388 F.2d 821, 823–24 (2d Cir.1968). *See also Union Oil v. Oppen,* 501 F.2d 558 (9th Cir.1974); *Pruitt v. Allied Chemical Corp.,* 523 F.Supp. 975 (E.D.Va.1981). *But see infra* note 12 and accompanying text.

**11.** The discussion that follows draws heavily on Judge Patrick Higginbotham's thorough and scholarly opinion in *Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019 (5th Cir.1985) (*en banc*), which surveys *Robins Dry Dock's* historical underpinnings and analyzes in detail the cases on which Justice Holmes relied. *See id.* at 1022–24.

■ As the majority of the Fifth Circuit sitting *en banc* has recently concluded, it is inconsistent with the cases on which Holmes relied to conclude that *Robins Dry Dock* states a narrow, fact-specific principle. *See Testbank, supra,* 752 F.2d at 1023-24. Those cases fairly support the proposition that negligently inflicted injuries to purely economic interests are simply not compensable, even though directly and foreseeably caused by the defendant's negligence. However tenuous or unforeseeable the connection between the damaged propeller in *Robins Dry Dock* and the time charterers' lost profits, the link between the defendant's negligence and the claimant's loss in a case such as *Byrd v. English* is direct and foreseeable. If one who negligently damages power lines cannot be held liable for the obvious consequences of such damage to the homes and businesses affected, it must be because the claimants' economic interests are of a kind that does not receive the protection of tort law against accidental harms. It follows that *Robins Dry Dock* ought sensibly to be read to establish an exception to maritime tort liability for negligently caused harm to such interests. *Testbank, supra,* 752 F.2d at 1024-25.

**B**

Although *Robins Dry Dock* was greeted somewhat critically, *see* Carpenter, *Interference with Contract Relations,* 41 Harv. L.Rev. 728, 738-42 (1928), it has proved surprisingly resilient. Two courts of appeal have confirmed its vitality only this year. *Barber Lines A/S v. M/V Donau Maru,* 764 F.2d 50 (1st Cir.1985); *Testbank, supra.* It has also found recent application in this district. *Getty Refining & Marketing Co. v. M/T Fadi B.,* 595 F.Supp. 452 (E.D.Pa.1984) (Van Artsdalen, J.). And some current academic comment reflects awareness that valid reasons can be advanced for a *Robins*-style limitation on tort recovery for harm to non-proprietary interests. *See, e.g.,* Rizzo, *A Theory of Economic Loss in the Law of Torts,* 11 J. Legal Studies 281 (1982); Note, Negligent Interference With Contract: Knowledge as a Standard for Recovery, 63 Va.L. Rev. 813 (1977). *But see* James, *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal,* 25 Vand.L.Rev. 43 (1972) (criticizing *Robins Dry Dock* rule as resting on pragmatic concerns that have been cast aside in other areas of tort law). Those judges and scholars who have most recently examined the issue have recognized the need to apply some such limitation in order to protect scarce judicial resources. Many accidents produce economic ripples which affect a theoretically infinite number of parties, each of whom may have to alter his behavior to his detriment because of the negligence of the party who brought about the initial injury. Each of these injured parties suffers a real loss for which tort law ought, in a perfectly just world, to provide redress. Yet compensating everyone who suffers some economic disadvantage from an accident would require both a staggering commitment of judicial resources—as courts struggle to determine the connection between the accident and each claimant's monetary loss—and a consequent risk of increasingly arbitrary, ad hoc decisionmaking at the margins. The Fifth Circuit's discussion in *Testbank* is instructive:

> The vessel delayed in St. Louis may be unable to fulfill its obligation to haul from Memphis, to the injury of the shipper, to the injury of the buyers, to the injury of their customers. Plaintiffs concede, as do all who attack the requirement of physical damage, that a line would need to be drawn—somewhere on the other side, each plaintiff would say in turn, of its recovery. Plaintiffs advocate not only that the lines be drawn elsewhere but also that they be drawn on an ad hoc and discrete basis. The result would be that no determinable measure of the limit of foreseeability would precede the decision on liability. We are told that when the claim is too remote, or too tenuous, recovery will be denied. Presumably then, as among all plaintiffs suffering foreseeable economic loss, re-

covery will turn on a [judge's] or jury's decision. There will be no rationale for the differing results save the "judgment" of the trier of fact. Concededly, it can "decide" all the claims presented, and with comparative if not absolute ease. The point is not that such a process cannot be administered but rather that its judgments would be much less the products of a determinable rule of law.

752 F.2d at 1028. Such unpredictability is of course most costly to the parties most often affected by the *Robins Dry Dock* rule—businesses which must plan and insure against contingent liabilities. The "victims" of *Robins Dry Dock's* limitation on recovery may thus be its real beneficiaries, for they exchange an especially dicey tort compensation system for the greater certainty of first-party insurance and/or contractual indemnification. *See Barber Lines v. M/V Donau Maru, supra,* at 54–55; Rizzo, *supra,* 11 J. Legal Studies at 391–97.

For these reasons, *Robins Dry Dock's* prudent limitation on tort recovery remains good law almost six decades after Justice Holmes rendered his decision.[12] *See, e.g., Barber Lines, supra; Testbank, supra; Kingston Shipping Co. v. Roberts,* 667 F.2d 34 (11th Cir.1982); *Getty Refining &*

*Marketing Co. v. M/T Fadi B., supra; In re Williamson Leasing Co.,* 577 F.Supp. 890 (E.D.Mo.1984); *General Foods Corp. v. United States,* 448 F.Supp. 111 (D.Md. 1978). I turn now to a consideration of the nature of the interest which *Robins Dry Dock* exempts from the protection of maritime tort law.

## C

The standard formulation of the *Robins Dry Dock* rule is that "physical damage to a proprietary interest [is] a prerequisite to recovery for economic loss in cases of unintentional maritime tort." *Testbank, supra,* 752 F.2d at 1020. *See also Barber Lines, supra,* at 51 (plaintiffs cannot recover damages for "negligently caused financial harm, even when foreseeable, except in special circumstances"; the "most common such special circumstance" is "physical injury to the plaintiffs or to their property"). *Cf. Venore Transportation Co. v. M/V Struma,* 583 F.2d 708, 710 (4th Cir.1978) (*Robins Dry Dock* embodies "the principle that one who unintentionally but negligently damages the property of another is not liable to others who may suffer economic loss because the owner is unable to perform contractual commitments to those others").[13] The issue in this

---

**12.** As I have already noted, *see supra* note 10, the Second and Ninth Circuits have read *Robins Dry Dock* rather narrowly. *See Union Oil v. Oppen,* 501 F.2d 558 (9th Cir.1974); *Petition of Kinsman Transit,* 388 F.2d 821 (2d Cir.1968). As the cases cited in the text show, however, neither *Union Oil* nor *Kinsman* has been well received outside its own circuit. Moreover, as the *Testbank* court noted, *see* 752 F.2d at 1025–27, neither case is wholly opposed to *Robins Dry Dock's* general limitation on tort liability. *Union Oil* held that commercial fishermen could recover for harm to their fishing operations occasioned by a mammoth oil spill. In so holding, the court noted the "special nature" of the fishermen's losses, and explicitly declined to permit other parties to recover for the economic harms they suffered. 501 F.2d at 570. *Kinsman,* while purporting to "leave the rock-strewn path of 'negligent interference with contract' for more familiar tort terrain," 388 F.2d at 824, appeared to adopt a somewhat restrictive foreseeability analysis which responds (albeit more haphazardly) to the same difficulties which prompted *Robins Dry Dock's* limitation. *Id.*

**13.** As the quoted passage from Judge Haynesworth's opinion in *Venore Transportation* indicates, there is some disagreement concerning whether *Robins Dry Dock* applies to interference with economic expectancies generally or only to interference with contractual interests. *See also Pruitt v. Allied Chemical Corp.,* 523 F.Supp. 975, 981 (E.D.Va.1981) (*Robins Dry Dock* rests on a contract rationale). The cases that differentiate between contractual and non-contractual interests do not, in my view, provide a sensible basis for the line they draw. Indeed, it would seem that contractual interests ought to receive at least as much protection as non-contractual expectancies—the latter, after all, are by definition more tentative and thus less likely to have induced heavy reliance costs. And to the extent *Robins Dry Dock's* principle "is essentially a principle of disallowance of damages because of remoteness," *Venore Transportation, supra,* 583 F.2d at 710, harm to non-contractual interests will typically be *more* remote than harm to contractual interests. "If a time charterer's relationship to its negligently injured vessel is too

case is whether Holt Marine had a "proprietary interest" in Pier 7 at the time of the accident.[14]

*Robins Dry Dock* has been most commonly applied where a facility used for commerce or transportation has been negligently damaged, thereby harming all those who would have used the facility during the time it undergoes repair. *See, e.g., Barber Lines, supra* (*Robins Dry Dock* bars claim by vessel delayed in using Boston Harbor due to defendant vessel's oil spill); *Testbank, supra* (businesses which had suffered economic losses due to the negligent contamination of the Mississippi River had no claim against those who caused the contamination); *Hercules Carriers, Inc. v. Florida,* 720 F.2d 1201 (11th Cir.1983) (*per curiam*) (*Robins Dry Dock* bars claim by vessels delayed in proceeding into Tampa Bay against vessel which hit a bridge and thereby blocked the entrance to the bay); *Dick Meyers Towing Serv. v. United States,* 577 F.2d 1023 (5th Cir.1978) (*per curiam*) (tugboat operator cannot recover against United States for negligent construction of canal lock whose failure forced curtailment of tugboat's business operations); *Louisville & Nashville R.R. v. M/V Bayou Lacombe,* 597 F.2d 469 (5th Cir.1979); (*Robins Dry Dock* bars claim by railroad for loss of use of bridge struck by defendant vessel, even though railroad had contractual right to use bridge along with bridge's owner); *Getty Refining & Marketing Co. v. M/T Fadi B.,* 595 F.Supp. 452 (E.D.Pa.1984) (operator of marine terminal cannot recover for loss of use of terminal against ship whose negligent inspection of its hull caused delays in unloading cargo at terminal); *General Foods Corp. v. United States,* 448 F.Supp. 111 (D.Md.1978) (*Robins Dry Dock* bars claim for added cost of transporting goods due to incapacitation of railroad bridge resulting from vessel's collision with bridge). *See also In re Williamson Leasing Co.,* 577 F.Supp. 890 (E.D.Mo. 1984) (*Robins Dry Dock* bars claims of railroad employees for lost wages against vessel which collided with railroad bridge and caused a ninety-one-day shutdown in the railroad); *Complaint of Great Lakes Towing Co.,* 395 F.Supp. 810 (N.D.Ohio 1974) (*Robins Dry Dock* bars action by dockworkers for wages lost when dock was

---

remote, other claimants without even the connection of a contract are even more remote." *Testbank, supra,* 752 F.2d at 1023.

I need not resolve this debate for purposes of deciding Yangming's motion in this case, for Holt Marine's interest in Pier 7 plainly arose out of its contract with Pierpoint.

**14.** Holt Marine argues in passing that, even if its interest in Pier 7 was not "proprietary" for *Robins Dry Dock* purposes, it is entitled to recover because of the "special relationship" which existed between it and Yangming. This argument is without merit. There is some support for the proposition that some kinds of *knowing* interferences with economic expectancies may give rise to tort liability. *See* W.P. Keeton, ed., *Prosser and Keeton on the Law of Torts* § 129, at 1000–1001 (5th ed. 1984); Comment, *Foreseeability of Third-Party Economic Injuries—A Problem in Analysis,* 20 U.Chi.L.Rev. 283, 295–96 (1953). However, Yangming denies that it can be charged with knowledge prior to the accident of Holt Marine's interest in Pier 7. Holt Marine does not point to record evidence from which I can conclude that no issue of material fact exists as to such knowledge.

Nor is it obvious that such knowledge would necessarily remove this case from the ambit of *Robins Dry Dock.* The "special relationship" cases have typically arisen in circumstances in which the defendant owed a heightened duty to the plaintiff because of the plaintiff's unavoidable dependence on the defendant's nonnegligent performance of its tasks. Thus, telegraph companies have been found liable for the negligent transmission of messages resulting in contractual losses. *Prosser and Keeton, supra,* § 129, at 1000. These cases create a "narrow" exception to the ordinary rule of non-recovery, "turning on a special relationship or an assumption of responsibility by the negligent promisor, and equally on the presence of a narrow and particular class of plaintiffs." *Id.* at 1000–01. *See also* Comment, *supra,* 20 U.Chi.L.Rev. at 296 (in telegraph cases, the recipient of the garbled message may often be the only party damaged, so that denying recovery would distort the telegraph company's incentive to send messages promptly and correctly). Holt Marine has not offered any authority for the proposition that this narrow exception encompasses ordinary ship-dock collision cases like this one. *Cf. Complaint of Great Lakes Towing Co.,* 395 F.Supp. 810 (N.D.Ohio 1974) (*Robins Dry Dock* bars action by dockworkers for wages lost when dock was negligently damaged).

negligently damaged); *Henderson v. Arundel Corp.*, 262 F.Supp. 152 (D.Md. 1966), *aff'd*, 384 F.2d 998 (4th Cir.1967) (*Robins Dry Dock* bars claims by seamen for wages lost when ship was negligently damaged); *Casado v. Schooner Pilgrim, Inc.*, 171 F.Supp. 78 (D.Mass.1959) (same). Adjudicating the economic loss claims in these cases would require expensive and duplicative litigation after every collision involving a frequently used facility. *Robins Dry Dock's* application serves to limit the pool of potential plaintiffs to those with the strongest interests in the thing damaged. Parties wishing to *use* a bridge or harbor are free to contract with the owners of these facilities for indemnity, or to otherwise insure against the risk that the facility will be unavailable.

It would serve no purpose to limit recovery to those who, under state property law, "owned" the facility in question. Owners (as in this case) may be absentees, having little to do with the day-to-day management of their property. Consequently, some other party, having a stronger possessory interest and more closely involved in ordinary management and maintenance of the property, may be better able to protect the property by promptly discovering damage, identifying those responsible, and bringing suit against them.[15] *Cf. J. Ray McDermott & Co. v. The SS Egero*, 453 F.2d 1202 (5th Cir.1972). The cases have responded to this concern by taking a practical approach to the question whether a particular plaintiff's interest is one which falls outside *Robins Dry Dock's* proscription, looking not to formalistic doctrines of property law but to whether the particular plaintiff had possession and control of the damaged property.

A trio of Fifth Circuit decisions illustrates the point. In *Louisville & Nashville R.R. v. M/V Bayou Lacombe*, 597 F.2d 469 (5th Cir.1979), the court found that the plaintiff railroad could not recover for loss of use of a bridge which the defendant vessel had struck. The railroad invoked a long-standing contractual right to use the bridge, and argued that that right constituted an easement. Since an easement was a "proprietary" interest, the argument went, *Robins Dry Dock* did not apply to bar the railroad's claim. 597 F.2d at 471–72. Judge Wisdom, writing for a unanimous panel, concluded that, under Alabama law, the interest which plaintiff held was not, in fact, an easement, but was wholly contractual. *Id.* at 473. He went on to state that "[e]ven if the Alabama courts would classify the plaintiff's rights in the bridge as a form of property interest created by virtue of its contract with the owner, that interest would form too slender a reed upon which to base a right of recovery despite *Robins.*" *Id.* The critical point, according to the court, was that plaintiff's interest did not include possession or control of the bridge:

> It is clear that the plaintiff's right to use the bridge has none of the incidents of ownership ... that would justify recovery for damage to physical property.... Louisville & Nashville never had possession or control of Southern's property.... The bridge is maintained entirely by Southern's employees; Louisville & Nashville has no obligation to repair the bridge or contribute to the cost of repairs in the event of damage by a third party.

*Id.* at 474.

If *Bayou Lacombe* stands for the proposition that *Robins Dry Dock* bars recovery for harm to some interests which may fall within the ambit of property law, then *J. Ray McDermott & Co. v. The S.S. Egero*, 453 F.2d 1202 (5th Cir.1972) stands for the flip side of that proposition: *Robins Dry Dock* does *not* bar recovery for harm to a contractual interest when the nature of the interest is sufficiently like that of a property owner. In *McDermott*, a building contractor was permitted to recover from a vessel which negligently dropped an anchor on a pipeline the contractor was building. Significantly, the court did not undertake

---

**15.** Interestingly, *Robins Dry Dock* appears not to bar the *owner* from suing even where he has no present possessory interest in the damaged property. *See Rogers Terminal & Shipping Corp. v. International Grain Transfer, Inc.*, 672 F.2d 464 (5th Cir.1982).

to determine the nature of the contractor's interest under state law. Instead, the court stated that "[t]he case at bar is a suit by the 'owner' of the pipeline project seeking reimbursement of expenses incurred under its subcontract when the project was delayed." 453 F.2d at 1204. The placement of the word "owner" in quotation marks suggests that the court was interested in functional and not formal ownership.

*Domar Ocean Transportation, Ltd. v. M/V Andrew Martin,* 754 F.2d 616 (5th Cir.1985), supports such a functional approach to the question whether an interest is proprietary for *Robins Dry Dock* purposes. The plaintiff in that case owned a barge, and chartered a tug to tow it. The plaintiff made certain improvements on the tug in order to facilitate its use with plaintiff's barge. 754 F.2d at 617–18. The defendant vessel struck plaintiff's barge. Plaintiff sought and recovered damages for, *inter alia,* loss of the "optimal" use of the chartered tug. *Id.* at 618. (Plaintiff had sub-chartered the tug after the accident.) The court approved this item of damages, reasoning that (1) the tug and barge were offered as a combination, and (2) plaintiff had the requisite proprietary interest in the tug-barge package to recover for loss of use of the tug. *Id.* at 619.

These cases plainly do not turn on state-law definitions of "property" interests. Indeed, the only one of the three cases which even mentions state law—*Bayou Lacombe* —expressly states that whatever the state-law classification of plaintiff's interest, that interest was insufficiently "proprietary" to satisfy *Robins.*[16] The cases seem instead to focus on whether, in each instance, the claimant had possession and control of the damaged property. Thus, in *Bayou Lacombe,* the court noted that the plaintiff did not perform ordinary maintenance and repair of the damaged bridge; by contrast, the pipeline contractor in

*McDermott* was the party which functionally "owned" the "pipeline project" by virtue of its supervision of the pipeline's construction. These distinctions, while perhaps fine ones, are nevertheless directly related to the reasons for the *Robins Dry Dock* limitation on tort recovery. Licenses to use the bridge in *Bayou Lacombe* might have been widely distributed; the management of the pipeline project in *McDermott* was necessarily concentrated in a single party. Consequently, the fears of never-ending economic ripple effects and duplicative litigation made no sense in the latter case, while the same fears seem to justify denying recovery in the former.

■ In short, the question whether Holt Marine had a proprietary interest in Pier 7 is not an issue whose resolution depends on the New Jersey law of property. Rather, the question—as to which there must be no genuine issue of material fact in order for Yangming to prevail—is whether Holt Marine's interest in the pier had sufficient "incidents of ownership" to render it "proprietary" as a matter of federal maritime law. *Bayou Lacombe, supra.*

### D

The question is a close one. Holt Marine does not contend that it exclusively possessed Pier 7 and controlled the pier's operations. Pierpoint was at all times free to use the pier to berth Retla vessels; Holt Marine could arrange berthings of its own only so long as those arrangements did not interfere with Pierpoint/Retla's requirements. Thus, Yangming argues, control over the pier's prime function—the berthing of vessels—was vested in Pierpoint, not Holt Marine. Moreover, this control was arguably exercised at the time of the accident: the Ming Joy was a Retla vessel, whose presence at the pier foreclosed Holt Marine from using the pier in any way that would conflict with the Ming Joy's need to dock and unload its cargo.[17]

---

16. Neither of the parties has identified any cases other than *Bayou Lacombe* which employ state law in determining whether *Robins Dry Dock* forecloses a claim for economic loss.

17. The record does not reveal who arranged for the berthing of the Ming Joy. The discussion in the text assumes *arguendo* that Pierpoint made the arrangements and communicated them to

Yangming's argument has substantial force. *Bayou Lacombe* plainly stands for the proposition that a joint user of property cannot recover for negligently inflicted damage to it when effective ownership of the property is vested in another. If Holt Marine simply used the pier alongside Pierpoint and subject to Pierpoint's priority, then Holt Marine's interest is no different from the railroad's interest in *Bayou Lacombe*, and its counterclaim should be dismissed.

The record before me does not, however, compel the conclusion that Holt Marine merely used the pier, in the manner of the railroad-plaintiff in *Bayou Lacombe*. The record suggests that Holt Marine both performed routine maintenance on the pier and purchased liability insurance for Pierpoint. In addition, it is undisputed that Holt Marine paid for all utilities necessary to its stevedoring operations. The record does not reveal whether Pierpoint paid for any utilities. Nor does the record show that Pierpoint representatives ever actually came to the pier. Thus, Holt Marine can argue that it was in fact the only party on the pier, that Pierpoint's "use" of the pier consisted of booking vessels for Holt Marine to unload. If such was the case, then Holt Marine's control of the pier and its operations was essentially complete, extending to everything but the choice of customers.

I find such control sufficient to survive summary judgment under *Robins Dry Dock* and its progeny. There is no danger of duplicative litigation in permitting one who exercises virtually unlimited control over a facility to bring suit when the facility suffers physical damage. Indeed, if Holt Marine's version of the facts is correct, it was the only party in a position to protect the property by discovering damage, identifying its cause, and taking appropriate action in response. It would be foolish to forbid such protective action by the only party able to take it in the interest of avoiding excessive litigation.

Holt Marine according to the ordinary practice

I emphasize that my conclusion is one which rests on a particular (and limited) record. I do not rule out the possibility that, at trial, Yangming will be able to establish that Holt Marine simply performed stevedoring services for Pierpoint, and that Pierpoint actually managed the pier's day-to-day operations. On this record, however, I cannot find conclusively that Holt Marine lacked the breadth of control which would exempt it from *Robins Dry Dock*'s limitation on tort recovery. Yangming's motion for summary judgment will be denied.

described in Thomas Holt's deposition.