In the Matter of The Petition of CLEVE-
LAND TANKERS, INC., as Owner and
Operator of the M/V JUPITER, For
Exoneration From or Limitation of Li-
ability.

No. 91–CV–70661–DT.

United States District Court,
E.D. Michigan, S.D.

Feb. 25, 1992.

Donald J. Miller; Richard McClear, Detroit, Mich., and Timothy M. Buck, New York City, for Total Petroleum, Inc.

John L. Foster and Paul D. Galea, Detroit, Mich., for Cleveland Tankers, Inc.

D. Michael O'Bryan, Birmingham, Mich., for Abdul Mussa, Kaid Shajrah, Masud Nagi Mohamed and Charles T. Prescott, III.

Leonard C. Jaques, Detroit, Mich., for James Thomas Warren, Joseph Callahan and Paula M. Sexton, Representative of the Estate of Thomas Sexton.

S. Olof Karlstrom, Flint, Mich., for Middle Ground Marina, Inc.

C. Peter Theut, Detroit, Mich. and Warren J. Marwedel, Chicago, Ill., for Fireman's Fund Ins.

Henry A. Pominville, Bay City, Mich., for Bay Aggregate, Inc.

Guy R. Greve, Bay City, Mich., for Pier 7, Inc. d/b/a Pier 7.

Kenneth J. Myles, Tawas City, Mich., for Straits Corp. Detroit & Mackinac Ry., Central Michigan Ry. and Straits Wood Treating.

William A. Moore, Detroit, Mich., for Warack Trucking, Intern. Materials, Inc. and Sargent Dock and Terminal, Inc.

James R. Meyer, Frankenmuth, Mich., for Steven B. Progler.

William C. Schaefer and Cheryl A. Cardelli, Detroit, Mich., for Mohamed Ahmed.

Merritt W. Green, II, Traverse City, Mich., for Peter Walton.

James C. Zeman, Detroit, Mich., for Adamo Contracting.

Gerald W. Pergande, Bay City, Mich., for City of Essexville, Mich.

H. Michael Dwan, Saginaw, Mich., for Pier 11, Inc.

## OPINION

DUGGAN, District Judge.

Presently before the Court are motions to dismiss filed by Cleveland Tankers, Inc. ("Cleveland") and Total Petroleum, Inc. ("Total"). In their motions, Cleveland and Total ask this Court to dismiss the economic damages claims made by several parties ("claimants") whose business interests were adversely affected by the accident between Cleveland's vessel the M/V JUPITER and Total's dock.[1] Most of the claim-

---

1. The parties who have filed claims against Cleveland for economic losses are as follows:

 1. Bay Aggregate, Inc., the operator of a marine terminal and commercial dock upstream from the site of the accident, claiming it incurred increased operating costs due to the closing of the channel.

 2. Pier 7, Inc., d/b/a Pier 7 Marina, a commercial marina located on the Saginaw River, claiming that it lost winter boat storage business as a result of the accident and the closing of the channel.

 3. Straits Corporation and its subsidiaries: Detroit & Mackinac Railway Company, Central Michigan Railway Company and Straits Wood Treating, Inc., which were affected by the accident in that their facilities near the accident site had to be closed during the fire and, as a result, incurred increased operating costs.

 4. Warack Trucking, a trucking company, claiming increased costs and lost business due to the closing of the channel.

 5. Steven B. Progler, a boat charterer, claiming to have lost three charters as a result of the closing of the channel.

 6. International Materials, Inc., claiming increased costs and lost business due to the closing of the channel.

 7. Sargent Docks and Terminal, Inc., claiming increased costs due to the closing of the channel.

 8. American Steamship Company, owner of the M/V BUFFALO, a vessel passing near the JUPITER at the time of the accident, claiming damages for interruption of its trade with the BUFFALO due to the accident.

 9. Adamo Contracting Corporation, a company engaged in dredging operations on the Saginaw River at the time of the accident, claiming uncompensated downtime relating to use of its equipment due to the closing of the channel.

 10. Middle Ground Marine, Inc., a marina located on the river, claiming lost income and smoke damage to its facilities

The parties who have filed claims against Total are as follows:

ants have filed responses to the motions to dismiss. On December 19, 1991, oral argument was heard on the motions. For the reasons which follow, this Court shall grant such motions.

## I. Background

On September 16, 1990, Cleveland's vessel, the M/V JUPITER, docked at Total's dock in the Saginaw River at Bay City, Michigan. The JUPITER was carrying a cargo of gasoline. As the JUPITER was unloading the gasoline at the Total dock an explosion and fire occurred. As a result of this accident the JUPITER broke loose from its mooring at the Total dock and drifted into the navigation channel of the river. The explosion and fire damaged the JUPITER to such an extent that the vessel partially sank in the channel. The JUPITER blocked all commercial navigation in the channel causing the Coast Guard to close the channel until October 22, 1990.

In the wake of the accident, litigation ensued. In February 1991, Cleveland filed a Petition for Exoneration From or Limitation of Liability and a third-party complaint against Total. Total thereafter filed a counterclaim against Cleveland. On March 15, 1991, this Court entered an Order which provided for notice of Cleveland's Petition, enjoined suits against Cleveland, and directed the filing of claims.

## II. Discussion

■ In support of its motion to dismiss the claimants' economic loss claims, Cleveland argues that the "bright line" rule, as set forth in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), and in cases such as *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019 (5th Cir.1985) (en banc), applies to such claims and requires their dismissal. Total's arguments in support of its

motion to dismiss are essentially identical to Cleveland's.

In response to Cleveland's and Total's arguments, the claimants argue that the bright line rule should not be used to bar their claims. Instead, they contend, the "traditional" test for tort liability, involving factors such as proximate cause, foreseeability and remoteness, as developed in cases such as *Petition of Kinsman Transit Co.*, 388 F.2d 821 (2nd Cir.1968) ("*Kinsman II*") should be used to determine the appropriateness of their claims. As an alternative basis of liability, the claimants argue that their claims for economic losses are cognizable under the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701–2761 ("OPA"), because gasoline was spilled into the river as a result of the accident.

In response to Total's motion to dismiss only, Bay Aggregate, Inc. asserts that the bright line rule cannot apply because its claim against Total relates to a non-maritime tort. To wit, Bay Aggregate argues that Total's negligence related to the design and condition of its dock and that, as a result, the tort which arose from such negligence occurred on land because a dock is considered an extension of land.

This Court finds Cleveland's and Total's arguments persuasive and shall grant their motions to dismiss.

The bright line rule draws its basis from the Supreme Court's decision in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). This decision was aptly discussed by the Fifth Circuit in *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019 (5th Cir.1985) (en banc):

In *Robins*, the time charterer of a steamship sued for profits lost when the defendant dry dock negligently damaged the vessel's propeller. The propeller had to be replaced, thus extending by two

1. Pier 7, Inc., d/b/a Pier 7 Marina, a commercial marina located on the Saginaw River, claiming that it lost winter boat storage business as a result of the accident and the closing of the channel.

2. Bay Aggregate, Inc., the operator of a marine terminal and commercial dock upstream from the site of the accident, claiming it in-

curred increased operating costs due to the closing of the channel.

3. American Steamship Company, owner of the M/V BUFFALO, a vessel passing near the JUPITER at the time of the accident, claiming damages for interruption of its trade with the BUFFALO due to the accident.

weeks the time the vessel was laid up in dry dock, and it was for the loss of use of the vessel for that period that the charterer sued. The Supreme Court denied recovery to the charterer, noting:

> ... no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with the other unknown to the doer of the wrong. (citation omitted). The law does not spread its protection so far.

275 U.S. at 309, 48 S.Ct. at 135. Justice Holmes did not stop with this delphic language, but with a citation to three cases added a further signal to his meaning:

> A good statement, applicable here, will be found in *Elliott Steam Tug Co. Ltd. v. The Shipping Controller*, [1922] 1 K.B. 127, 139, 140; *Byrd v. English*, 117 Ga. 192 [191], 43 S.E. 419 [ (1903) ]; *The Federal No. 2*, (C.C.A. [2nd Cir.1927] 21 F.2d 313.

*Id.*

The plaintiff in *Elliott Steam Tug* was a charterer of a tug boat who lost profits when the vessel was requisitioned by the admiralty under wartime legislative powers. In applying an indemnity statute that authorized recovery, the court noted that the charterer could not have recovered at common law: "[t]he charterer in collision cases does not recover profits, *not because the loss of profits during repairs is not the direct consequence of the wrong*, but because the common law rightly or wrongly does not recognize him as able to sue for such an injury to his mere contractual rights." *Id.* at 140. (emphasis supplied). In *Byrd v. English*, recovery of lost profits was denied when a utility's electrical conduits were negligently damaged by defendant, cutting off power to plaintiff's printing plant. In the *Federal No. 2*, the third case cited by Justice Holmes, the defendant tug negligently injured plaintiff's employee while he was working on a barge. The Second Circuit denied the employer recovery from the tug for sums paid to the employee in maintenance and cure. The court (Manton, Swan and Augustus Hand) explained:

> It is too indirect to insist that this may be recovered, where there is neither the natural right nor legal relationship between the appellant and the tug, even though the alleged right of action be based upon negligence.

21 F.2d at 314.

*TESTBANK*, 752 F.2d at 1022–23 (emphasis in original).

The *TESTBANK* court commented on the impact of *Robins Dry Dock:*

> The principle that there could be no recovery for economic loss absent physical injury to a proprietary interest was not only well established when *Robins Dry Dock* was decided, but was remarkably resilient as well. Its strength is demonstrated by the circumstance that *Robins Dry Dock* came ten years after Judge Cardozo's shattering of privity in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916). *See also Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922). Indeed this limit on liability stood against a sea of change in the tort law. Retention of this conspicuous bright-line rule in the face of the reforms brought by the increased influence of the school of legal realism is strong testament to the rule's utility and to the absence of a more "conceptually pure" substitute.

*Id.* at 1023.

The *TESTBANK* court, after discussing *Robins Dry Dock*, went on to apply its rationale in the maritime case before it. In *TESTBANK* two ships had collided on the Mississippi River. As a result of the collision, one of the ships, the TESTBANK, spilled cargo containing chemicals into the river and the Coast Guard closed the affected part of the river for several weeks, halting fishing, shrimping and other commercial activity in that part of the river. Several lawsuits were later filed against the shipowners. Many of the suits were tort claims by shippers, marina and boat rental businesses, seafood businesses, bait

shops, and restaurants for the economic losses they suffered as a result of the accident and the closing of the river. The shipowners moved for summary judgment on such claims because the economic loss claimants had not suffered any physical damage to their property as a result of the incident.[2] The district court granted summary judgment as to all the claimants except the commercial fisherman, shrimpers, and other businesses that had derived their income directly from the river.

The unsuccessful claimants appealed. Initially, a panel of the Fifth Circuit affirmed the district court, relying on *Robins Dry Dock. Id.* at 1021. In *TESTBANK*, the Fifth Circuit, en banc, again affirmed the district court, and employed the bright line rule. *Id.* The court specifically held that, in order for the economic loss claimants to be entitled to recovery, they had to have economic loss claims accompanied by physical damage to a proprietary interest. *Id.* The court stated:

[W]e are unpersuaded that we ought to drop physical damage to a proprietary interest as a prerequisite to recovery for economic loss. To the contrary, our re-examination of the history and central purpose of this pragmatic restriction on the doctrine of foreseeability heightens our commitment to it. Ultimately we conclude that without this limitation foreseeability loses much of its ability to function as a rule of law.

*Id.*

In summary, the bright line rule set forth in *TESTBANK* may be stated as follows: A claim by a party for recovery of economic losses from the negligent tortfeasor will only be allowed where the party has suffered physical damage to a proprietary interest as a result of the tortfeasor's negligence. *See TESTBANK* at 1021.

Other circuit courts follow the bright line rule. *See Getty Refining & Marketing Co. v. M/T FADI B,* 766 F.2d 829 (3rd Cir.1985); *Barber Lines A/S v. M/V DONAU MARU,* 764 F.2d 50 (1st Cir.1985); and, *Kingston Shipping Co. v. Roberts,* 667 F.2d 34 (11th Cir.1982) (per curiam).

This Court finds unpersuasive claimants' argument that the bright line rule should not be employed and that, instead, the traditional test involving tort factors such as foreseeability, proximate cause and remoteness as set forth in *Kinsman II* should be employed.

In *Kinsman II*, a ship broke loose from its moorings on the Buffalo River in Buffalo, New York and struck another ship, breaking it loose from its moorings also. The two ships then crashed into a bridge spanning the river. The wreckage of the ships and the bridge formed a dam which resulted in flooding and a disruption of river traffic for almost two months. Because of this incident, the plaintiffs in the case incurred increased expenses in performing various wheat and corn transportation contracts. The defendants argued that such claims should be denied. The *Kinsman II* court dismissed such claims, but only on the basis that the damages claimed were too remote. *Kinsman II,* 388 F.2d at 824. In reaching such a decision, the *Kinsman II* court did not employ any sort of bright line rule. Instead, it merely applied traditional negligence tort concepts of foreseeability, proximate cause, and remoteness—and rejected the claimants' claims as being too remote. *Id.* at 824–25.

The claimants point out that *Kinsman II*'s use of traditional tort concepts is not without adherents, citing *Marine Navigation Sulphur Carriers, Inc. v. Lone Star Industries, Inc.,* 638 F.2d 700 (4th Cir. 1981).[3]

---

**2.** The *TESTBANK* court defined the claims subject to summary judgment as follows:

Stated more generally, the summary judgment denied the claims asserted by shipping interests suffering losses from delays or rerouting, marina and boat operators, wholesale and retail seafood enterprises not actually engaged in fishing, shrimping, crabbing or oystering in the area, seafood restaurants, tackle

and bait shops, and recreational fisherman, oysterman, shrimpers and crabbers. *Id.* at 1021 n. 2.

**3.** The Fourth Circuit in *Marine Navigation* affirmed the district court's use of the *Kinsman II* analysis for economic loss claims made by businesses affected by the closing of a river due to a maritime accident, but who had suffered no physical injury due to the accident. *Id.* at 702.

In *TESTBANK* the claimants argued against use of the bright line rule since it would deny tort recovery for foreseeable injury caused by negligent acts. The *TESTBANK* claimants wanted the traditional tort test of *Kinsman II* applied. The *TESTBANK* court strongly rejected such argument. This Court finds the reasons expressed by that court in its rejection of the claimants' argument compelling. The *TESTBANK* court reasoned:

> Plaintiffs urge that the requirement of physical injury to a proprietary interest is arbitrary, unfair, and illogical, as it denies recovery for foreseeable injury caused by negligent acts. At its bottom the argument is that questions of remoteness ought to be left to the trier of fact. Ultimately the question becomes who ought to decide—judge or jury—and whether there will be a rule beyond the jacket of a given case. The plaintiffs contend that the "problem" need not be separately addressed, but instead should be handled by "traditional" principles of tort law.
>
> Those who would delete the requirement of physical damage have no rule or principle to substitute. Their approach fails to recognize limits upon the adjudicating ability of courts. We do not mean just the ability to supply a judgment; prerequisite to this adjudicatory function are preexisting rules, whether the creature of courts or legislatures. Courts can decide cases without preexisting normative guidance but the result becomes less judicial and more the product of a managerial, legislative or negotiated function. (footnote omitted.)
>
> Review of the foreseeable consequences of the collision of the SEA DANIEL and the TESTBANK demonstrates the wave upon wave of successive economic consequences and the managerial role plaintiff would have us assume. The vessel delayed in St. Louis may be unable to fulfill its obligation to haul from Memphis, to the injury of the shipper, to the injury of the buyers, to the injury of the customers. Plaintiffs concede, as do all who attack the requirement of physical damage, that a line would need to be drawn—somewhere on the other side, each plaintiff would say in turn, of its recovery. Plaintiffs advocate not only that the lines be drawn elsewhere but also that they be drawn on an ad hoc and discrete basis. The result would be that no determinable measure of the limit of foreseeability would precede the decision on liability. We are told that when the claim is too tenuous, recovery will be denied. Presumably then, as among all plaintiffs suffering foreseeable economic loss, recovery will turn on a judge or jury's decision. There will be no rationale for the differing results save the "judgment" of the trier of fact. Concededly, it can "decide" all the claims presented, and with comparative if not absolute ease. The point is not that such a process cannot be administered but rather that its judgments would be much less the products of a determinable rule of law. In this important sense, the resulting decisions would be judicial products only in their draw upon judicial resources.
>
> The bright line rule of damage to a proprietary interest, as most, has the virtue of predictability with the vice of creating results in cases at its edge that are said to be "unjust" or "unfair." Plaintiffs point to seemingly perverse results, where claims the rule allows and those it disallows are juxtaposed—such as vessels striking a dock, causing minor but recoverable damage, then lurching athwart a channel causing great but unrecoverable economic loss. The answer is that when lines are drawn sufficiently sharp in their definitional edges to be reasonable and predictable, such differing results are the inevitable result—indeed, decisions are the desired

However, the decision affirmed was a dismissal of those claims on motion of the defendants for the stated reason that *Kinsman II* had ruled that such claims were "too remote to be legally compensable." *Id.* As such, *Marine Navigation,* contrary to the claimants' assertion in the case at bar, appears to stand for a "bright line" rule, based on *Kinsman II,* for economic loss claims unaccompanied by physical injury.

product. But there is more. The line drawing sought by plaintiffs is no less arbitrary because the line drawing appears only in the outcome—as one claimant is found too remote and another is allowed to recover. The true difference is that plaintiffs' approach would mask the results. The present rule would be more candid, and in addition, by making results more predictable, serves a normative function. It operates as a rule of law and allows a court to adjudicate rather than manage. (footnote omitted.)

*TESTBANK* at 1028–29.

The *TESTBANK* court cited additional, economic, considerations in support of its decision to use the bright line rule. The court reasoned that imposing liability on a negligent tortfeasor for the economic losses of claimants who did not suffer any physical injury as the result of the tortfeasor's negligence would, in the long run, not serve to insure safety. *Id.* at 1029. Further, such open-ended liability for economic losses, if imposed on the tortfeasor, could increase the insurance costs for covering such liability to a prohibitive level, whereas the claimants could insure against such economic loss more readily via first party or loss insurance. *Id.*

The First Circuit in *Barber Lines* used reasoning quite similar to the *TESTBANK* court's in adopting a bright line rule barring maritime tort claims for economic loss by parties who did not suffer any physical damage to a proprietary interest. *See Barber Lines,* 764 F.2d at 54–56.

The claimants argue that the Sixth Circuit follows the *Kinsman II* traditional tort analysis in maritime tort claims for economic losses. The claimants predicate their argument on two Sixth Circuit decisions, *National Steel Corp. v. Great Lakes Towing Co.,* 574 F.2d 339 (6th Cir.1978), and *In re Bethlehem Steel Corp.,* 631 F.2d 441, 448–49 (6th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981).

This Court finds such argument unpersuasive. *National Steel* is distinguishable. In that case, a vessel that was being towed by the defendant hit a bridge owned by the plaintiff. The plaintiff, a steel manufacturer, used the bridge as its sole means of transporting hot ore from its blast furnaces located on an island to its steelmaking facility located on the mainland. The accident physically damaged the bridge enough to require the plaintiff to reduce its loads of hot ore across the bridge. By the time the bridge was repaired, the plaintiff had lost several thousand tons of steel production due to the reduction in ore loads. The plaintiff brought a maritime tort claim against the defendant for, among other things, the economic losses due to the reduction in steel production. The Sixth Circuit ruled that the plaintiff's claim was allowable in that the economic losses it suffered were foreseeable and were proximately caused by the defendant's negligence. *Id.* at 342–43. In so ruling, however, the court noted that the plaintiff had suffered physical damage to its property, the bridge, as a result of the defendant's negligence and that the plaintiff's economic loss had resulted from this damage. *Id.* As such, *National Steel* does not provide any indication as to how the Sixth Circuit has ruled, or might rule, on the precise issue in the case at bar because the claimant in *National Steel* had suffered physical damage to a proprietary interest. The bright line rule, by its very terms, does not exclude such claims.

The second case the claimants rely upon, *In re Bethlehem Steel Corp.,* does not, in this Court's opinion, lend support to their argument that the Sixth Circuit would adopt the *Kinsman II* analysis for their claims. In *Bethlehem Steel,* a ship collided with a highway bridge over the Welland Canal in Canada. As a result of this collision, the canal was closed for approximately two weeks. The shipowner filed a limitation of liability action in Canada. Also, several claims were asserted against the shipowner in federal district court in Ohio. The district court applied Canadian law in resolving the claims before it. The parties appealed and the Sixth Circuit affirmed the district court.

A large part of the appeal related to the claims of the owners of the ships that had

been delayed by the closing of the canal, but had suffered no physical damage as a result of the accident. The trial court in the Canadian action had dismissed these claims, finding that such economic loss claims unaccompanied by physical injury to the claimants were not recoverable under Canadian law. The district court in the United States case had also dismissed the claims by adopting the reasoning of the Canadian court. The claimants raised two issues on appeal:

> [F]irst, that the district court and the Canadian trial court erred in holding that under Canadian law a person may not recover purely economic losses resulting from another's negligence in the absence of physical damage to his person or property. [Second,] that even if the district court's construction of Canadian law is correct, there is an "overriding domestic policy translated into law" which requires courts of this country to permit recovery in such circumstances.

*Bethlehem Steel* at 446.

Addressing the first issue, the Sixth Circuit found no error in the district court's decision on Canadian law. The court noted that Canadian law was unclear on the issue of whether a claimant may recover economic loss when it has suffered no physical injury. *Id.* The court discussed two Canadian cases which had addressed the issue, and which had reached opposite results— *Rivtow Marine Ltd. v. Washington Iron Works,* [1974] S.C.R. 1189 (allowing recovery for such claims) and *Gypsum Carrier Inc. v. The Queen,* [1978] 1 F.C. 147, 78 D.L.R. (3d) 175 (not allowing recovery for such claims). *Id.* The court ruled that the district court in following *Gypsum Carrier,* a case it viewed as presenting similar claims to those made in the case at bar, and in following the decision of the court in the Canadian case relating to the accident, which it viewed as presenting identical claims to those made in the case at bar, had not erred in its application of Canadian law. *Id.* at 447.

With regard to the second issue, whether there was an overriding domestic policy under United States law allowing for the recovery of such claims, the *Bethlehem Steel* court found none. *Id.* at 448. Although the court concluded that "there is no absolute rule either in Canada or the United States which forbids recovery for economic loss where the claimant has suffered no physical injury," *id.,* such conclusion must be viewed in the context of the issue it resolved—whether there was an "overriding domestic policy" under United States law sufficient to overcome the district court's use of Canadian law. The *Bethlehem Steel* court decided only that precise issue. It did not announce any rule for such claims. Indeed, although the court did discuss *Kinsman II*'s analysis as an example of United States law that differed from the Canadian law employed by the district court, *id.* at 447–48, the court's refusal to declare the *Kinsman II* analysis to be the representative and overriding analysis under United States law cuts against the claimants' argument in the case at bar that the *Bethlehem Steel* court adopted *Kinsman II* as the law of the Sixth Circuit.[4]

The claimants argue that *Union Oil Co. v. Oppen,* 501 F.2d 558 (9th Cir.1974), counsels against adoption of the bright line rule. The claimants in *TESTBANK* made a similar argument and the court there rejected such argument:

> Yet *Union Oil*'s holding was carefully limited to commercial fishermen, plaintiffs whose economic losses were characterized as "of a particular and special nature." *Union Oil,* 501 F.2d at 570. The *Union Oil* panel expressly declined to "open the door to claims that may be asserted by ... other[s] ... whose economic or personal affairs were discommoded by the oil spill" and noted that the general rule denying recovery for pure economic loss had "a legitimate sphere

---

**4.** Further, a close reading of the *Bethlehem Steel* court's discussion of *Kinsman II* reveals that the court discussed the case only because the claim- ants there had offered it as an example of the "overriding domestic policy" of the United States with regard to the economic loss issue.

within which to operate." *Id.* (footnote omitted.)

*TESTBANK,* 752 F.2d at 1026–27.

The claimants also argue that the bright line rule, which draws its basis from *Robins Dry Dock,* should apply only to interference with contract claims because *Robins Dry Dock* involved a contract claim. This Court finds such argument unpersuasive for two reasons. First, the claimants in *TESTBANK,* whose claims were denied per the bright line rule, were not basing their claims on interference with contract theories. Second, the court in *Barber Lines* explicitly rejected a contract argument similar to that raised by the claimants here.[5] *Barber Lines,* 764 F.2d at 51.

Relatedly, the claimants argue that their economic loss claims are not solely claims for lost profits, but also include claims for increased operating expenses incurred as a result of the accident. They submit that these latter losses are not subject to the bright line rule because the claimant in *Robins Dry Dock* sought only lost profits damages. This argument is unpersuasive. The court in *Barber Lines* rejected a similar argument, noting that Justice Holmes, in *Robins Dry Dock,* referred to cases involving both added expenses and lost profits. *Id.*

■ In response to Total's motion to dismiss, Bay Aggregate argues that its economic loss claims should not be dismissed because the negligence claimed against Total relates to Total's dock, which is an extension of land and thus does not involve maritime tort. Bay Aggregate contends that Total was negligent in providing a dock that was too short to accommodate vessels such as the JUPITER and that the inadequate dock caused the accident.

■ Even if this theory is true, this Court finds unpersuasive Bay Aggregate's argument that it has not alleged a claim against Total in maritime tort. Bay Aggregate does not dispute the fact that the JUPITER's blocking of the channel, necessitating the closing of the channel, was the immediate cause of its economic losses. In fact, Bay Aggregate cannot seriously argue that the *effect* of Total's alleged negligence with regard to the dock was the accident involving the JUPITER. This effect clearly took place on navigable waters, the Saginaw River. As such, the situs requirement for admiralty jurisdiction[6] is met with regard to Bay Aggregate's claim against Total. *See Harville v. Johns–Manville Products Corp.,* 731 F.2d 775, 782 (11th Cir.1984) ("Under the locality test, the tort occurs 'where the alleged negligence took effect,' rather than where the negligent act was done").

■ Cleveland, in a supplement to its Motion to Dismiss, argues that the claim of Middle Ground Marine, Inc. ("Middle Ground") should be dismissed pursuant to Rule F(5) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure be-

---

5. The Claimants also argue that two district court cases in the Fifth Circuit undercut the persuasiveness of *TESTBANK* because they did not adopt the bright line rule. These cases are *In re Lyra Shipping Co.,* 360 F.Supp. 1188 (E.D.La.1973) and *In re China Union Lines, Ltd.,* 285 F.Supp. 426 (S.D.Tex.1967). This Court finds such argument unpersuasive. These cases were decided well before *TESTBANK* and, as district court cases, did not necessarily constitute the law of the Fifth Circuit. *TESTBANK,* as an en banc decision of the Fifth Circuit which has not been overruled to date, clearly means that the bright line rule adopted in the case is the law of that circuit. Further, the First Circuit in *Barber Lines* was confronted by a similar argument by the claimants there and concluded that *TESTBANK* had overruled *Lyra Shipping* and *China Union. Barber Lines,* 764 F.2d at 52–53.

6. In order to come within admiralty jurisdiction, the Supreme Court has ruled that the following requirements must exist: (1) locality ("situs"), i.e., that the incident giving rise to the claim occur on navigable waters; (2) the incident giving rise to the claim must have the potential to disrupt maritime commerce; and (3) the activity giving rise to the incident must have a substantial relationship to traditional maritime activity. *See Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982); *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990).

Bay Aggregate's dock argument goes to the first requirement, the locality ("situs") requirement.

cause such claim was filed late. Cleveland notes that on March 15, 1991, this Court entered an Order Directing Notice to Issue and Enjoining Suits and Directing Filing of Claims which provided that claims for damages arising out of the accident be filed on or before April 19, 1991. Cleveland points out that Middle Ground did not file its claim until September 16, 1991. Cleveland argues that Middle Ground can offer no reason to excuse the tardiness of the claim.

Middle Ground argues that, although its president Robert Craig, had signed a release for claims relating to damages to his personal boat on November 13, 1990, it had no notice of Cleveland's limitation action until it received such notice on August 12, 1991, in a letter from counsel for Cleveland. Middle Ground further asserts that this Court has discretion to allow the late filing of claims.

Supplemental Rule F(4) allows this Court to extend the time for filing a claim for "cause shown." This Court has broad discretion in making such a decision, especially where " 'the limitation proceeding is pending and undetermined, and the rights of the parties are not adversely affected....' " *Sagastume v. Lampsis Navigation Ltd.*, 579 F.2d 222, 224 (2nd Cir.1978). Middle Ground has provided a plausible reason for its untimely claim, lack of actual notice of the limitation action, and Cleveland has offered no showing of prejudice, beyond the fact of untimeliness, if Middle Ground's claim is allowed. Under such circumstances, this Court shall exercise its discretion under Supplemental Rule F(4) and allow Middle Ground's claim.

■ Several of the claimants also argue that their claims for economic losses are cognizable under the OPA because gasoline was spilled into the river as a result of the accident. The claimants assert that Cleveland and/or Total is liable to them for their economic loss claims under 33 U.S.C. § 2702(a), which imposes liability for oil spills on the responsible party, and 33 U.S.C. § 2702(b)(2)(C) & (E), which allows claimants to recover damages for loss of subsistence use of natural resources and economic damages incurred as a result of an oil spill.

This Court finds claimants' OPA argument unpersuasive. Section 2702(a) of the Act provides:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or facility from which oil is discharged ... into or upon the navigable waters ... is liable for ... damages specified in subsection (b) that result from such incident.

Subsection (b)(2) of § 2702 allows damages for:

(C) Subsistence use

> Damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

\*　　\*　　\*　　\*　　\*　　\*

(E) Profits and earning capacity

> Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

■ These two damages provisions of the OPA do not allow recovery for the economic losses claimed by the claimants here. The claimants cannot recover damages under § 2702(b)(2)(C). Contrary to the claimants' assertion, they did not use the river for "subsistence use"—such term relates to use of a natural resource, such as water, to obtain the minimum necessities for life.[7] The claimants seek to stretch the term well beyond its plain meaning to include as "subsistence" any business activity.

Also, the claimants cannot recover damages under § 2702(b)(2)(E). This subsec-

---

7. "Subsistence" is defined as: "means of subsisting ... the minimum (as of food and shelter) necessary to support life ... a source or means of obtaining the necessities of life." *Webster's Ninth New Collegiate Dictionary*, 1176 (1986).

tion allows damages only for "loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources." None of the claimants, save for Middle Ground, have alleged "injury, destruction, or loss" to their property.

### III. Conclusion

The bright line rule as set forth in *TEST-BANK* applies to the claimants and serves to bar their economic loss claims because they have not alleged physical injury to a proprietary interest. Therefore, Cleveland's and Total's motions to dismiss such claims shall be granted.[8]

---

8. In its claim, Middle Ground Marine, Inc. alleges smoke damage to its property. Such an allegation states a claim for damages related to a physical injury to a proprietary interest. Therefore, this Court must deny Cleveland's motion to dismiss Middle Ground's claim insofar as the damages sought relate to such claim of physical injury. Simply put, the bright line rule does not exclude such claims. Therefore the motions shall not be granted as to the damage claims asserted by Middle Ground insofar as such claims are based on its allegation of physical injury, smoke damage, to its facilities.